# STATE OF CONNECTICUT *v.* ADRIAN FLORES
## (SC 20512)

Robinson, C. J., and McDonald, D'Auria, Mullins, Kahn,
Ecker and Keller, Js.

*Syllabus*

Convicted of home invasion, burglary in the first degree, attempt to commit
robbery in the first degree, and conspiracy to commit home invasion,
the defendant appealed to this court. The defendant and his friend, B,
had agreed to steal drugs and money from the home of the defendant's
drug dealer, D. After ingesting cocaine and acquiring various tools and
supplies from B's workplace, the defendant and B drove to D's home,
which they entered through the basement. The defendant and B were
wearing facemasks and armed with box cutters, and B also held a
machete. After they were confronted by D and other occupants of D's
home, the defendant and B fled and were later apprehended by the police.
Prior to trial, the defendant moved to suppress a written statement he
made after being brought to the police station, claiming that it was
inadmissible pursuant to the statute (§ 54-1o) governing the admissibility
of statements made in the course of an unrecorded custodial interroga-
tion at a place of detention. Following a hearing, at which the defendant
and several police officers testified, the court denied the motion to
suppress. The court concluded that, although the electronic recording
of the encounter in which the defendant had made his statement was
not preserved, the state had overcome the statute's presumption of

---

[9] This process might function similar to that set out in *State* v. *Polanco*,
308 Conn. 242, 260–63, 61 A.3d 1084 (2013), which requires that, when a
defendant is found guilty of greater and lesser included offenses in violation
of the double jeopardy clause, the trial court must vacate the verdict on
the lesser included offense.

State *v.* Flores

inadmissibility of the defendant's written statement under § 54-1o (h) because the failure to preserve the electronic recording was not in bad faith and because the state had established, by a preponderance of the evidence, that the defendant's statement was voluntary and reliable. At trial, the prosecutor also sought to admit into evidence a cooperation agreement that the state had entered into with B. Pursuant to that agreement, B agreed to testify truthfully, and the state agreed that it would "make known to the sentencing court [in B's criminal case] the nature, extent, value, and truthfulness of [B's] information and testimony." Defense counsel objected to the admission of that agreement, claiming that the portions of the agreement regarding B's obligation to testify truthfully constituted improper vouching for B's credibility. The trial court overruled defense counsel's objection and admitted the agreement in its entirety. *Held*:

1. The trial court correctly determined that the state had established, by a preponderance of the evidence, that the defendant's written statement to the police was both voluntary and reliable and, therefore, admissible under § 54-1o, and, accordingly, the court properly denied the defendant's motion to suppress:

   a. The defendant could not prevail on his claim that the trial court's findings were clearly erroneous insofar as the court determined that, while the defendant was in a holding cell and without any prompting, he told a police sergeant that he wanted to give a statement: there was no evidence that the sergeant approached the defendant in his cell, as the sergeant testified that he had joined the defendant in the processing room, and this court therefore declined to rely on that subsidiary factual finding in determining whether the defendant's statement was voluntary; moreover, because there was at least some evidence in the record that the defendant's offer to make a statement was not prompted by the police, that subsidiary finding was not clearly erroneous, and, regardless of whether the statement was unprompted, it was undisputed that the defendant responded affirmatively when the police asked if he would provide a statement.

   b. The defendant's statement was voluntary insofar as he implicitly gave a knowing, voluntary waiver of his rights under *Miranda* v. *Arizona* (384 U.S. 436): the defendant responded affirmatively and without any reservations when asked whether he would provide a statement, he received two *Miranda* warnings before making his statement, at all times, he stated that he understood his rights and had a calm and cooperative demeanor, and the facts demonstrated, and the defendant specifically testified, that he was not coerced or threatened in any manner; moreover, the trial court specifically discredited the defendant's testimony that he had been cold, tired, under the influence of alcohol and narcotics, and not proficient in English at the time he made his statement, the court instead credited the police officers' testimony that the defendant spoke and understood English and did not appear to be tired or under the

State *v.* Flores

influence of alcohol or drugs, and, because the defendant did not dispute the trial court's findings in that regard as clearly erroneous, this court would not second-guess the trial court's credibility determinations; furthermore, this court declined the defendant's request to read a requirement into § 54-1o that the state provide a valid explanation for its failure to record and preserve a custodial interrogation for the defendant's statement to be admissible, the legislature having declined to require the state to provide such an explanation in order to overcome the presumption of inadmissibility set forth in that statute.

c. In view of the totality of the circumstances, the defendant's statement was voluntary under due process principles: the record supported the trial court's findings, which the defendant did not claim were clearly erroneous, that he spoke and understood English at the time of the interrogation, the interrogation occurred only a few hours after the defendant's arrest and lasted for only about thirty minutes, and there was no evidence of physical or psychological punishment or the use of any potentially coercive interrogation methods.

d. The trial court did not abuse its discretion in determining that the defendant's statement was reliable: the testimony of B, D, and the occupants of D's home corroborated the defendant's statement, the defendant testified that the substance of the statement was accurate, and none of the undisputed facts demonstrated that the defendant was coerced into giving a false confession.

2. The defendant could not prevail on his claim that the truthfulness provisions contained in the cooperation agreement between B and the state constituted improper vouching for B's credibility, as a matter of both evidentiary law and prosecutorial impropriety: truthfulness provisions do not constitute impermissible vouching when they merely reveal that a witness has an obligation to testify truthfully and explain the consequences of a breach of that obligation, but such provisions constitute impermissible vouching when the prosecutor explicitly or implicitly indicates that he or she has verified the truth of the testimony presented to the fact finder, when they refer to facts not in evidence, or when they offer the prosecutor's personal opinion of the truthfulness of the witness' testimony; in the present case, the provisions stating that B had a duty to "truthfully disclose" and "truthfully testify," and that he could be charged with perjury if he lied, did not constitute impermissible vouching, as they merely stated B's obligation to testify truthfully and explained the consequences of his failure to do so; moreover, although the provision stating that the prosecutor would "make known to the sentencing court [in B's criminal case] the nature, extent, value, and truthfulness of [B's] information and testimony" came very close to impermissibly suggesting to the jury that the prosecutor had access to tools or information, not available to the jury, that the prosecutor would use to ensure that the witness tells the truth, nothing in the agreement suggested that the prosecutor already had verified the truth of B's testi-

State *v.* Flores

mony, the determination of the truthfulness of B's testimony was left to the jury, and the state's role in determining credibility under the agreement would not arise until the sentencing hearing in B's separate criminal case; furthermore, although it would have been better if the trial court had omitted the reference to the provision regarding what the prosecutor would have made known to the sentencing court in B's criminal case, this court stopped short of concluding that the trial court abused its discretion, as an evidentiary matter, in admitting it; accordingly, because the trial court did not abuse its discretion in admitting the truthfulness provisions as a matter of evidentiary law, the defendant's claim that the admission of the truthfulness provisions constituted prosecutorial impropriety also failed; nevertheless, this court emphasized that the state must take care in drafting cooperation agreements and that trial courts must carefully examine their language before admitting them fully into evidence, it cautioned the state not to insinuate in future cooperation agreements or in argument to the jury that it has verified testimony or that it is in a position to monitor and accurately verify a witness' testimony, and it encouraged courts to address concerns about improper vouching in cooperative agreements by making appropriate redactions.

3. The evidence was sufficient to prove beyond a reasonable doubt that the defendant committed the crimes of which he was convicted:

a. The evidence was sufficient to convict the defendant of attempt to commit robbery in the first degree: contrary to the defendant's argument that the state had to prove beyond a reasonable doubt both that he intended to commit a larceny and that he intended to do so through the use or threatened use of force, it was well settled that the intent element of robbery relates to the commission of the larceny and not to the use or threatened use of physical force; moreover, even if the evidence was insufficient to establish that the defendant actually used or threatened the use of a box cutter, the defendant was charged and convicted of only attempt to commit robbery, and the defendant's conduct in asking B to procure weapons, kicking down the door to D's basement knowing that at least one person was home, and stating that he would do whatever it took to get money and drugs, including using force and tying up the occupants, was sufficient to establish that he took a substantial step in using or threatening to use the box cutter.

b. The evidence was sufficient to convict the defendant of burglary in the first degree: the defendant conceded that, to establish the particular offense of burglary in the first degree with which he was charged, the state had to prove beyond a reasonable doubt only that he was armed with a dangerous instrument, not that he used or displayed a dangerous instrument; moreover, the jury reasonably could have found that the defendant used or attempted to use a box cutter in circumstances such that its use or attempted use was capable of causing death or serious physical injury.

State *v.* Flores

c. The evidence was sufficient to support the defendant's conviction of conspiracy to commit home invasion, predicated on his attempt to commit robbery in the first degree: because conspiracy is a specific intent crime, specific intent is required for every element of home invasion, including, in this case, the predicate felony of attempt to commit robbery in the first degree, and, although the defendant relied on his own testimony in support of his claim that he and B had agreed only to enter and commit a larceny in D's home and not to hurt anyone therein, the jury was not required to credit his testimony; moreover, there was sufficient other evidence, which the jury was entitled to credit, that the defendant had the specific intent to use or threaten the use of physical force against another person for the purpose of compelling that person to deliver property, including B's testimony that the defendant had agreed to use whatever force was necessary to force the occupants of D's home to comply and that he had asked B to gather the machete, box cutters, and other supplies, including zip ties and duct tape, the defendant's own statement to the police, in which he indicated those supplies would be used in case they needed to tie up D, and the testimony of D's brother that the defendant was holding a sharp object or knife when the occupants of D's home confronted the defendant after he forced his way into their basement.

(*Two justices concurring separately in one opinion*)

Argued March 28—officially released September 20, 2022

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of home invasion, burglary in the first degree, conspiracy to commit home invasion and conspiracy to commit burglary in the first degree, and with one count each of the crimes of attempt to commit robbery in the first degree and conspiracy to commit robbery in the first degree, brought to the Superior Court in the judicial district of Windham, where the court, *Swords, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the case was tried to the jury before *Swords, J.*; verdict of guilty; subsequently, the court vacated the verdict as to one count each of conspiracy to commit home invasion and conspiracy to commit robbery in the first degree, and two counts of conspiracy to commit burglary in the first degree; judgment of guilty of two counts each of home invasion and burglary in the first degree,

State *v.* Flores

and one count each of attempt to commit robbery in the first degree and conspiracy to commit home invasion, from which the defendant appealed to this court. *Affirmed.*

*Alice Osedach*, assigned counsel, for the appellant (defendant).

*Meryl R. Gersz*, deputy assistant state's attorney, with whom, on the brief, were *Anne F. Mahoney*, state's attorney, and *Louis J. Luba, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. The defendant, Adrian Flores, directly appeals from the judgment of conviction, rendered after a jury trial, of home invasion in violation of General Statutes § 53a-100aa (a) (1); home invasion in violation of General Statutes § 53a-100aa (a) (2); burglary in the first degree in violation of General Statutes § 53a-101 (a) (1); burglary in the first degree in violation of General Statutes § 53a-101 (a) (3); attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (3); and conspiracy to commit home invasion in violation of General Statutes §§ 53a-48 (a) and 53a-100aa (a) (1). On appeal, he claims that (1) the trial court improperly denied his motion to suppress his written statement to the police, who failed to comply with the requirements of General Statutes § 54-1o, (2) the trial court improperly admitted into evidence the entirety of the cooperation agreement between the state and his accomplice, Benjamin J. Bellavance, including portions regarding Bellavance's obligation to testify truthfully, and (3) there was insufficient evidence to convict him of attempt to commit robbery in the first degree, home invasion predicated on attempt to commit robbery in the first degree, burglary in the first degree, home invasion predicated on burglary in

State *v.* Flores

the first degree, and conspiracy to commit home invasion. We affirm the judgment of conviction.

Based on the evidence admitted at trial, the jury reasonably could have found the following facts. The defendant approached his friend, Bellavance, about a plan to steal drugs and money from the residence of the defendant's drug dealer, Daniel Bowling (Daniel). The defendant knew where Daniel lived because he previously had been to the residence to buy drugs from him. Bellavance, who was addicted to cocaine at the time, agreed to the defendant's plan.

On the day of the incident, December 21, 2017, the defendant and Bellavance ingested cocaine and then drove to A.J. Manufacturing, LLC, where Bellavance worked. Both men went inside and obtained two box cutters, zip ties, duct tape, two chisels, and plastic gloves. Once it was dark outside, Bellavance drove the defendant to Daniel's residence in Woodstock, a single-family house where he resided with his mother, Rhonda Bowling, and his father, Raymond M. Bowling, Jr. (Raymond Jr.). The defendant directed Bellavance not to park near Daniel's house but, rather, to park about one mile down the road. The defendant and Bellavance, who took turns holding a black duffel bag containing the items gathered at the store, then walked toward Daniel's house. Both men wore partial facemasks, and each had a box cutter. Bellavance also carried a machete, which he concealed in his pants, although the defendant was aware that he carried it. The men walked to the back basement door of Daniel's house. The defendant kicked in the door, and they entered the residence.

Daniel, whose bedroom was located in the basement of the house, was home with his mother and father. Daniel's older brother, Raymond Bowling III (Raymond III), also was at the residence visiting his family. All four family members were upstairs when they heard a

State *v.* Flores

loud noise from the basement. Daniel, Raymond Jr., and Raymond III ran down the basement stairs while Rhonda grabbed a kitchen knife and called 911. When Daniel, Raymond Jr., and Raymond III reached the bottom of the basement steps, they saw the defendant and Bellavance standing inside the basement with masks partially covering their faces. Bellavance was holding a machete and carrying a black duffel bag. The defendant was holding "[s]ome type of knife" or "something else sharp . . . ." Raymond III asked the intruders what they were going to do. Bellavance raised the machete, but, when Raymond III repeated his question, the defendant and Bellavance remained quiet, and then turned and ran out of the basement door. Raymond III grabbed a shovel and chased the intruders down the driveway. The defendant slipped and fell on the driveway, causing his facemask to slip and allowing Raymond III to see his face. Raymond III hit the defendant in the chest with the shovel. Bellavance, seeing this altercation, swung the black duffel bag at Raymond III but missed him. The defendant grabbed the shovel from Raymond III, threw it in the woods and, with Bellavance, ran toward their vehicle.

Raymond III got into his vehicle and drove in the direction that the defendant and Bellavance had run until he encountered their unoccupied vehicle parked down the road. He drove back to his parents' residence and gave the license plate number to Rhonda, who remained on the telephone with the police. He then drove back to the intruders' unoccupied vehicle to prevent them from fleeing. Meanwhile, the defendant and Bellavance hid in the woods near their vehicle. They remained in the woods for approximately one to one and one-half hours until the police discovered them. While being taken into custody, the defendant stated that Daniel was his drug dealer. A patdown of the defendant revealed that he had a box cutter in the front

State *v.* Flores

pocket of his jacket. Additionally, the police found the machete and the black duffel bag containing the zip ties, duct tape, two chisels, and plastic gloves on the ground by a tree near the defendant and Bellavance. The defendant was arrested and transported to the police station, where he gave a statement to the police.

Following his arrest, the defendant was charged with two counts of home invasion, two counts of burglary in the first degree, one count of attempt to commit robbery in the first degree, and five conspiracy counts.[1] After a jury trial, the defendant was found guilty on all ten counts. At sentencing, the court vacated the verdict as to four of the five conspiracy counts,[2] leaving intact only the verdict on the count of conspiracy to commit home invasion predicated on robbery. The court sentenced the defendant to a total effective term of twenty-five years of incarceration, execution suspended after fifteen years, ten years of which was a mandatory minimum, followed by five years of probation. The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3). We will discuss additional facts and procedural history as necessary.

I

The defendant claims that the trial court improperly denied his motion to suppress his written statement to

[1] Specifically, the defendant was charged with two counts of home invasion in violation of § 53a-100aa (a) (1) and (2); two counts of burglary in the first degree in violation of § 53a-101 (a) (1) and (3); attempt to commit robbery in the first degree in violation of §§ 53a-49 (a) (2) and 53a-134 (a) (3); two counts of conspiracy to commit home invasion in violation of §§ 53a-48 (a) and 53a-100aa (a) (1) and (2); two counts of conspiracy to commit burglary in the first degree in violation of §§ 53a-48 (a) and 53a-101 (a) (1) and (3); and one count of conspiracy to commit robbery in the first degree in violation of §§ 53a-48 (a) and 53a-134 (a) (3).

[2] The trial court vacated the verdict as to the counts of the information that charged the defendant with conspiracy to commit home invasion in violation of §§ 53a-48 (a) and 53a-100aa (a) (2); conspiracy to commit burglary in the first degree in violation of §§ 53a-48 (a) and 53a-101 (a) (1); conspiracy to commit burglary in the first degree in violation of §§ 53a-48

State *v.* Flores

the police because the police had failed to comply with the requirements of § 54-1o. Specifically, he argues that the state failed to prove that he voluntarily made the statement and that the statement was reliable. We disagree.

The following additional facts and procedural history are relevant to this claim. After the defendant was arrested and brought to the police station, he provided a written statement to the police. Prior to trial, the defendant filed a motion to suppress this statement, arguing that it was inadmissible under § 54-1o because it was made as part of a custodial interrogation, which the state had failed to electronically record. The trial court then held a hearing on the motion during which several police officers and the defendant testified. The trial court later issued an oral decision on the record denying the defendant's motion to suppress.

In ruling on the defendant's motion, the trial court made the following subsidiary findings, which we quote at length: "[The defendant and Bellavance] were . . . transported to [the state police] Troop D [barracks in Danielson] and placed in individual cells at approximately 11:30 p.m. While the defendant was in his cell, Sergeant John Gregorzek . . . approached his cell and asked the defendant his name and date of birth; at that time, the defendant, unprompted, told Gregorzek that he wanted to give a statement; Gregorzek followed up by asking if the defendant would provide a statement, and the defendant responded yes, and . . . then . . . the defendant, unprompted, proceeded to give . . . a rundown of the events . . . of that night. Gregorzek then assigned Trooper Michael P. Gibson to advise the defendant of his rights. Accordingly, Gibson removed the defendant from the cell and brought him into the processing room . . . . At approximately 3:10 a.m.

(a) and 53a-101 (a) (3); and conspiracy to commit robbery in the first degree in violation of §§ 53a-48 (a) and 53a-134 (a) (3).

State *v.* Flores

Gibson . . . advised the defendant, inter alia, of his right[s] to [remain] silen[t], to an attorney, and to be interviewed about the conditions of his release. State's exhibit 3 sets out those rights in both English and in Spanish. After Gibson read this form to the defendant, the defendant was allowed to read state's exhibit 3 for himself; after doing so, the defendant signed his name in the box at the bottom of the form. This entire procedure was witnessed by Gregorzek.

"The defendant told Gibson that he wanted to give a statement. Commencing at 3:20 a.m., therefore, Gibson read to the defendant state's exhibit 2, titled 'Notice and Waiver of Rights.' Gibson started by reading verbatim the top portion of the form, which advised the defendant, inter alia, of his right to remain silent, right to an attorney, right to have an attorney present during any questioning, and the right to stop answering questions at any time. The defendant told Gibson he understood these rights; he then signed the notice of rights form, and Gibson signed as a witness. Gibson then read the defendant the lower portion of the form, state's exhibit 3, consisting of three separate waivers of rights. These waivers included the desire to speak with the state police without consulting with an attorney or having an attorney present and the defendant's acknowledgment that he was waiving his rights freely, voluntarily, and without threats or promises. Gibson read each of these rights one by one, and the defendant placed his initials after each one. . . .

"After the defendant signed his waiver of rights form, Gibson then began to fill in the blanks at the top of the form, including the date, location, case number, etc. At this point, the case officer, Trooper Jana R. Mazzarella . . . entered the room and took over questioning the defendant while Gibson left to help process the evidence.

State *v.* Flores

"The defendant told Mazzarella what had occurred during the [incident]. Simultaneously, Mazzarella typed this information onto the statement form . . . [then] put the events in chronological order. . . . According to Mazzarella, this information was consistent with the facts reported by the residents and found by state police investigators.

"The written statement was completed at 3:48 a.m. After the statement was completed, Mazzarella read the entire statement verbatim to the defendant, including the preprinted notice at the top, which again advised the defendant, inter alia, of his right[s] to remain silent, to consult with an attorney, to have an attorney present, and to terminate questioning at any time. . . . The defendant then read his statement himself; after doing so, he signed it in Mazzarella's presence. . . .

"At no time during the various advisements of rights or during his interview did the defendant ask any questions about his rights or indicate that he didn't understand his rights. At all times, he spoke with Gibson, Gregorzek and Mazzarella in English, and he never asked for a Spanish interpreter. The defendant did not appear to be under the influence of alcohol, drugs, or any other substance, and he never indicated that he was in any way under the influence or . . . incapacitated. At all times, he appeared to understand and be aware of what was happening. He never indicated that he was cold or uncomfortable or injured or that he wanted to take a break or was tired. No threats or promises were made to the defendant by Gregorzek, Gibson, or Mazzarella; nor is there any evidence of physical or mental coercion being exerted against him. The defendant never asked for an attorney, never asked to stop answering questions, and never indicated that he wanted to stop talking to the state police. His demeanor was calm and cooperative throughout. . . .

State *v.* Flores

"In his testimony, the defendant claimed that, in 2017, his English was not very good and that, on the night he was arrested by the police, he was under the influence of alcohol, cocaine and Percocet. He further claimed that he was confused, cold, tired, and scared when questioned by the police. Moreover, he claims that, prior to December 21, [2017], he had never heard of *Miranda*[3] rights . . . [and] that he didn't understand he had the right to an attorney or the right not to talk to the police. . . .

"At the time of his arrest, the defendant was the manager of a restaurant in Putnam. At no point during the hearing before this court did the defendant use the assistance of a Spanish language interpreter, even though one was available and sitting in the courtroom. Throughout his testimony, it was obvious to the court that the defendant understands English very well. Additionally, consistent with his multiyear upbringing in California, where he undoubtedly attended public school, the defendant speaks English without any trace of an accent. The court finds that the defendant's claims that he was under the influence, that he was confused, tired and scared, that he didn't understand his right[s] to an attorney or to silence, and that his English was not good in 2017, to be not credible. The court finds Mazzarella's, Gibson's, and Gregorzek's testimony to be credible and adopts their versions of the events surrounding the defendant's advisement . . . the advisement of the defendant's rights, his waiver of rights, and the execution of his statement."

The court further stated: "Although the defendant's confession was recorded, no . . . steps were taken on December 21, [2017], to preserve the interview. Mazzarella testified [that] she was not aware on December

---

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

State *v.* Flores

21, 2017, that she needed to notify a supervisor of the necessity to preserve the defendant's interview and that the supervisor would thereafter have preserved it. . . . Because no request to preserve the defendant's interview was received within thirty days, according to Mazzarella, in accordance with state police procedures, the defendant's interview was recorded over. Mazzarella further testified that she only discovered in October, 2018, that the confession had not been preserved."

In light of the totality of these subsidiary facts, the trial court found by a preponderance of the evidence that (1) the state's failure to preserve the defendant's statement was not done in bad faith, intentionally, recklessly, or negligently, (2) the defendant voluntarily gave the statement, and (3) the defendant's statement was reliable. As a result, the trial court concluded that the state had satisfied its burden of overcoming the presumption of inadmissibility under § 54-1o.

"[Section] 54-1o provides that, if a person suspected of one of several enumerated classes of felonies gives a statement to law enforcement as a result of a custodial interrogation at a detention facility, the statement will be presumed to be inadmissible unless officers make an audiovisual recording of the interrogation. Under subsection (h) of the statute, the state may overcome the presumption of inadmissibility in any case by proving by a preponderance of the evidence that the statement 'was voluntarily given and is reliable, based on the totality of the circumstances.' General Statutes § 54-1o (h)." *State* v. *Christopher S.*, 338 Conn. 255, 258–59, 257 A.3d 912 (2021). "The voluntariness inquiry addresses a defendant's constitutional right to due process and, potentially, those rights protected by *Miranda*, without regard to whether a confession is true. Reliability, on the other hand, is concerned with whether a statement is true." Id., 284. "[T]he defendant's claim is constitutional with respect to the voluntariness inquiry

State *v.* Flores

and evidentiary with respect to the reliability inquiry.''
Id., 267. The defendant claims that the trial court erred
in finding that the defendant's statement was voluntary
and reliable.

A

"The standard of review of a trial court's ruling on
voluntariness in the context of the state's motion to
admit a defendant's confession under § 54-1o (h) is the
same as when a defendant moves to suppress a state-
ment on the ground that it was given involuntarily. [T]he
trial court's findings as to the circumstances sur-
rounding the defendant's interrogation and confession
are findings of fact . . . which will not be overturned
unless they are clearly erroneous. . . . [A]lthough we
give deference to the trial court concerning these sub-
sidiary factual determinations, such deference is not
proper concerning the ultimate legal determination of
voluntariness. . . . Consistent with the well estab-
lished approach taken by the United States Supreme
Court, we review the voluntariness of a confession inde-
pendently, based on our own scrupulous examination
of the record. . . . Accordingly, we conduct a plenary
review of the record in order to make an independent
determination of voluntariness.'' (Internal quotation
marks omitted.) Id., 274–75.

In *Christopher S.*, we recognized that the term "volun-
tariness'' may encompass two traditional tests: "(1) that
the defendant's statement was taken in accordance with
the requirements of *Miranda*, and (2) that the police
did not overbear the defendant's will in violation of his
right to due process.'' Id., 273–74. We did not decide,
however, whether the state must prove both due pro-
cess voluntariness and compliance with *Miranda*
because we held in that case that, even if we assumed
that the state did have to prove both, the record sup-
ported the trial court's determination that there was

State *v.* Flores

no *Miranda* violation and that the defendant gave his statement voluntarily under the totality of the circumstances. See id., 274. In the present case, we likewise do not decide this issue. Here, too, the record supports the trial court's determination that there was no *Miranda* violation and that the defendant's statement was voluntarily given under the totality of the circumstances.

1

Initially, we note that the parties do not dispute most of the trial court's subsidiary factual findings. The defendant, however, argues that the trial court's findings were clearly erroneous inasmuch as there is no evidence to support the court's finding that, while he was in his cell, he, "unprompted, told Gregorzek that he wanted to give a statement" and, "unprompted, [he] proceeded to give . . . a rundown of the events . . . of that night."[4] The defendant contends that he never offered to give a statement "unprompted" and that, when he agreed to give a statement, he was not in his cell.

The state concedes that there is no evidence that Gregorzek approached the defendant in his holding cell. Rather, Gregorzek testified that he joined Gibson and the defendant in the processing room as Gibson read the defendant his rights. As a result, we do not rely on this subsidiary factual finding in determining whether the defendant's statement was voluntary. The state does not concede, however, that the trial court's finding that the defendant offered to give a statement to Gregorzek

[4] The defendant also argues that the finding that "Gregorzek then assigned . . . Gibson to advise the defendant of his rights" was clearly erroneous. He contends that the evidence shows that Mazzarella asked Gibson to process him and to advise him of his rights. We disagree. Gregorzek testified that he went to the processing room to ensure that Gibson read the defendant his rights. Gibson testified that he was asked to help Mazzarella process the defendant but did not specify who asked him.

State *v.* Flores

"unprompted" was clearly erroneous, arguing that the testimony was ambiguous as to this fact.

During the hearing on the defendant's motion to suppress, Gregorzek testified that he went to the processing room where Gibson and the defendant were located to ensure that Gibson read the defendant his rights. He stated that he was present while Gibson advised the defendant of his rights. The prosecutor then asked Gregorzek if there was any type of coercion of the defendant to sign the forms waiving his rights. Gregorzek responded that "the defendant was more than willing to provide a statement at that time and actually was— was the one that almost approached us to—to provide a statement. We—we asked him if he was willing to provide one, and he was more than willing at that point." To clarify, the prosecutor asked, "based [on] what you're saying, he [the defendant] was the one [who] actually approached—or broached the subject—subject of giving a statement." Gregorzek responded, "[c]orrect." Subsequently, however, Gregorzek testified that he "asked [the defendant] if he would be willing to provide a statement to us, and he was, again, willing, and so I said okay." To again clarify, the trial court asked the following: "Did I understand correctly that you went to the holding cell, and you asked the defendant if he would give a statement, and he said that he was willing to, and then he proceeded to tell you what the events were that had taken place?" Gregorzek responded, "[y]es, Your Honor, aside from it wasn't the holding cell, it was the processing room." Gibson also testified that Gregorzek asked the defendant if he wanted to provide a statement and that the defendant responded that he was willing to do so.

We agree with the state that the record is ambiguous regarding whether the defendant offered to provide a statement "unprompted." There was at least some evidence in the record to support the trial court's subsid-

State *v.* Flores

iary finding that the defendant offered to give a
statement unprompted and we, therefore, cannot say
that this finding is clearly erroneous. Even if we do
not rely on this finding in our determination regarding
voluntariness, we conclude that the trial court correctly
determined that the defendant's statement was volun-
tary. In so concluding, we do rely, however, on the trial
court's undisputed finding that, when asked if he would
provide a statement, the defendant responded affirma-
tively.

2

Regarding his *Miranda* rights, the defendant argues
that his statement was inadmissible because he never
gave a "knowing" and "voluntary" waiver of his *Miranda*
rights. The waiver of a defendant's *Miranda* rights
"must be voluntary in the sense that it was the product
of a free and deliberate choice rather than intimidation,
coercion, or deception, and made with a full awareness
of both the nature of the right being abandoned and
the consequences of the decision to abandon it. . . .
Despite this seemingly difficult task, [t]he prosecution
. . . does not need to show that a waiver of *Miranda*
rights was express. An implicit waiver of the right to
remain silent is sufficient to admit a suspect's statement
into evidence. . . . [When] the prosecution shows that
a *Miranda* warning was given and that it was under-
stood by the accused, an accused's uncoerced state-
ment establishes an implied waiver of the right to
remain silent. . . . [T]he state must demonstrate . . .
(1) that the defendant understood his rights, and (2)
that the defendant's course of conduct indicated that
he did, in fact, waive those rights . . . ." (Citations
omitted; emphasis omitted; internal quotation marks
omitted.) *State* v. *Christopher S.*, supra, 338 Conn. 278.

The undisputed subsidiary facts show that, when the
defendant was asked if he would provide a statement,

State *v.* Flores

he responded affirmatively without any reservations. He then received two *Miranda* warnings before he made his statement to the police. Additionally, after the defendant gave his statement, Mazzarella read it verbatim back to him, including the preprinted notice at the top, which again advised him of his right to remain silent, to consult with an attorney, to have an attorney present, and to terminate questioning at any time. At all times, the defendant stated that he understood his rights, and his demeanor remained calm and cooperative. Additionally, the trial court credited the testimony of Mazzarella, Gibson, and Gregorzek that the defendant spoke and understood English, did not appear tired, and did not appear under the influence of alcohol or narcotics. The subsidiary facts also show that the defendant's statement was not coerced. In fact, the defendant specifically testified that he was not coerced or threatened in any manner. Nor does anything in the record suggest that Mazzarella obtained the defendant's cooperation through physical or psychological coercion, trickery, threats, promises of leniency, or other questionable tactics. On this record, it is clear that the defendant received his *Miranda* warnings, understood these warnings, and voluntarily participated in Mazzarella's interrogation of him. Accordingly, he implicitly gave a knowing, voluntary waiver of his *Miranda* rights.

The defendant nevertheless argues that his statement was not voluntary because he did not have the ability to understand or to act on his constitutional rights. He relies on his own testimony at the suppression hearing that he had been cold, tired, and under the influence of alcohol and narcotics. He also highlights his testimony that his English was not good at the time of the statement and that he did not understand that he could refuse to give a statement. The defendant, however, does not dispute as clearly erroneous the trial court's subsidiary findings that he did not appear to be under

State *v.* Flores

the influence of alcohol or narcotics, that he was cooperative and calm, that he spoke English and understood what was happening, and that he never indicated that he was tired or cold. Rather, the defendant urges this court to credit his testimony, which the trial court specifically discredited, over the testimony of Gregorzek, Gibson, and Mazzarella, which the trial court specifically credited. "[I]t is not the function of this court to [second-guess] the trial court's reasoned credibility determinations . . . ." *State* v. *Jones*, 281 Conn. 613, 655, 916 A.2d 17 (2007).

Additionally, in arguing that his statement was not voluntary, the defendant asks this court to determine whether the state validly explained its failures to record and preserve the confession.[5] He argues that, without this consideration, the statute is essentially toothless, given the low standard required for the state to overcome the statutory presumption.

This court has recognized that it is for the legislature, not this court, to "[weigh] and balanc[e] . . . the benefits and drawbacks of an electronic recording requirement, and to create the parameters of such a rule." (Internal quotation marks omitted.) *State* v. *Christopher S.*, supra, 338 Conn. 299. In doing so, our legislature determined that the statutory presumption of inadmissibility under § 54-1o may be overcome by a preponderance of the evidence. Although this is a low standard, we must assume that the legislature was aware of that when it enacted the statute. Additionally, the legislature did not include any requirement in § 54-1o that the state provide a "valid explanation" for its failures to record and preserve the confession. We therefore decline the

_____

[5] The defendant also argues that the lack of a valid explanation should render the statement's admission per se harmful and automatically reversible. Such a requirement would conflict with the statute's plain language, however, which allows the state to overcome the presumption of inadmissibility by a preponderance of the evidence.

State *v.* Flores

defendant's request that we go beyond the legislature's prescribed requirements and require the state to establish a valid explanation for its failure to comply with § 54-1o for the defendant's statement to be admissible. If the legislature wants to revisit this issue, it is, of course, free to do so. See *State* v. *Christopher S.*, supra, 299–300.

3

Regarding the defendant's due process rights, "any use in a criminal trial of an involuntary confession is a denial of due process of law. . . . The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . [i]s the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . The determination, by the trial court, whether a confession is voluntary must be grounded [on] a consideration of the circumstances surrounding it. . . . Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . Under the due process clause of the fourteenth amendment, however, in order for a confession to be deemed involuntary and thus inadmissible at trial . . . there must be an essential link

State *v.* Flores

between [the] coercive activity of the [s]tate, on the one hand, and a resulting confession by a defendant, on the other . . . .'' (Citations omitted; internal quotation marks omitted.) Id., 280–81.

The record in the present case simply does not support the defendant's claim that the interrogation violated his due process rights. Instead, the record supports the trial court's determination that the defendant voluntarily gave his statement to Mazzarella. Based on the trial court's subsidiary findings, which the defendant does not dispute as clearly erroneous on appeal, at the time of the interrogation, the defendant spoke and understood English, did not appear to the officers to be under the influence of alcohol or narcotics, and maintained a calm and cooperative demeanor. Even if the defendant did dispute the trial court's subsidiary finding that he understood English, the record fully supports this finding. Although the defendant was born in Mexico City, the trial court simply did not credit the defendant's claim that, at the time of the interrogation, he did not speak or understand English well, undermining the voluntariness of his statement. He spoke without an accent at trial and worked as a manager at a restaurant in Putnam at the time of his arrest. He had lived in San Diego in his youth before moving back to Mexico, and then, around age eighteen to twenty, lived in the United States continuously for the fourteen to sixteen years before his arrest.

Additionally, the defendant agreed to provide a statement, and was advised of his *Miranda* rights twice. The interrogation occurred only a few hours after his arrest and lasted only approximately thirty minutes. There is no evidence of physical or psychological punishment. There also is no evidence that Mazzarella used any potentially coercive methods, such as threats, promises of leniency, or deception. Accordingly, the defendant's

State *v.* Flores

statement was voluntary under both *Miranda* and due process principles.

B

"[T]he reliability inquiry is evidentiary in nature. The standard that we apply in reviewing a trial court's evidentiary ruling depends on the context in which the ruling was made. . . . When a trial court's determination of admissibility is founded on an accurate understanding of the law, it must stand unless there is a showing of an abuse of discretion. . . . When the admissibility of the challenged testimony turns on the interpretation of an evidentiary rule, however, we are presented with a legal question and our review is plenary." (Internal quotation marks omitted.) Id., 284. In determining reliability, courts consider the circumstances under which a statement was given and any evidence that independently corroborates the substantive truth of the defendant's statement. See id., 286–87.

In the present case, the defendant's argument that his statement was not reliable derives only from the fact that it was not recorded and preserved, as the statute requires. It is clear from the trial court's subsidiary findings and the record, however, that the trial court did not abuse its discretion in determining that the defendant's statement was reliable. First, and most important, the defendant testified that the substance of his statement was accurate. Second, there was significant, independent evidence that corroborated the defendant's statement—specifically, the testimony of Bellavance and the testimony of the four victims. Moreover, as discussed, none of the undisputed subsidiary facts shows that the defendant was coerced into giving a false confession.

Accordingly, we conclude that the trial court properly found that the state established by a preponderance of the evidence that the defendant's statement was both

State *v.* Flores

voluntary and reliable and, therefore, admissible under
§ 54-1o.

II

Next, the defendant claims that the trial court improp-
erly admitted into evidence the entire cooperation
agreement between Bellavance and the state. More pre-
cisely, he argues that the admission of the provisions
regarding Bellavance's obligation to testify truthfully
constituted improper vouching, both as a matter of evi-
dentiary law and as a matter of prosecutorial impropri-
ety. We conclude that the trial court did not abuse its
discretion in admitting the challenged provisions in the
present case. We emphasize, however, that the state
must take care in drafting its cooperation agreements,
and trial courts must carefully examine their language
before admitting them fully into evidence.

In its case-in-chief, the state questioned Bellavance
on direct examination regarding the fact that he had
entered into a plea agreement and a cooperation agree-
ment with the state. Specifically, Bellavance testified
that, in January, 2019, he entered into a plea agreement
that included a sentencing range of zero to twenty years
of incarceration. According to Bellavance, at the time he
entered into this plea deal, the state had not discussed
entering into a cooperation agreement with him. Bella-
vance testified that, after entering into the plea agree-
ment, on the advice of his counsel, he approached the
state about entering into a cooperation agreement.

Bellavance ultimately entered into such a coopera-
tion agreement, which provided in relevant part that,
"at the time of sentencing the [s]tate's [a]ttorney's
[o]ffice will make known to the sentencing court the
nature, extent, value, and *truthfulness* of the witness'
information and testimony. The defendant retains the
right to argue for a lesser sentence than that recom-
mended by the [s]tate, including a sentence that

State *v.* Flores

includes a period of probation and/or special parole. The witness understands that the sentence to be imposed rests entirely with the sentencing court and that he cannot rescind or withdraw his plea of guilty in the event that the court imposes a sentence different from that recommended by the [s]tate's [a]ttorney's [o]ffice.'' (Emphasis added.) The cooperation agreement further provided: ''The witness understands that he must truthfully disclose all information with respect to his criminal activities and the criminal activities of others concerning all matters about which this office and any investigating police agency inquires of him and, furthermore, that he shall truthfully testify at any trial or other court proceeding with respect to any matters about which this office or the investigating police agency may request his testimony. . . . It is further understood and agreed that the witness must at all times give complete, truthful and accurate information and testimony and must not commit any further crimes whatsoever during the pendency of this agreement. Should the witness commit any further crimes or should it be reasonably determined by the [s]tate's [a]ttorney's [o]ffice that he has given false, incomplete or misleading testimony or information, or has otherwise violated any provision of this agreement, he shall thereafter be subject to prosecution for any state criminal offense of which this office has knowledge, including, but not limited to, the offenses described above, perjury, and hindering prosecution.''

The prosecutor then sought to enter the entire cooperation agreement into evidence during his direct examination of Bellavance. Defense counsel objected, arguing that it was not relevant and that it constituted vouching because ''the prosecutor is going to be making a decision about whether . . . Bellavance is telling the truth or not into whether he gets his bargain . . . .'' He argued that ''it's a little bit of a backdoor way of

State *v.* Flores

getting in for the state and the prosecutor to be vouching for the credibility of the witness . . . .'' The trial court assumed that, in cross-examining Bellavance, defense counsel planned to attack his credibility and ruled that the cooperation agreement was "clearly relevant" to rehabilitate his credibility. The trial court asked defense counsel if he had a problem with any particular portions of the cooperation agreement. In response, defense counsel admitted that he "intend[ed] on attacking . . . Bellavance's credibility. That's going to be part of my cross-examination.'' Nevertheless, he argued that he did not agree that the cooperation agreement would reha-bilitate Bellavance unless there would be evidence that the prosecutor believed he was telling the truth, which would be improper. Defense counsel also requested that the trial court specifically redact the provision stat-ing that, "at the time of sentencing the [s]tate's [a]ttor-ney's [o]ffice will make known to the sentencing court the nature, extent, value, and truthfulness of the wit-ness' information and testimony,'' arguing that this showed that the state was going to decide the truthful-ness of Bellavance's testimony. The prosecutor responded, stating that the cooperation agreement did not contain any vouching because it merely stated that it was Bellavance's "obligation to be truthful and that he understands that there are penalties that are related to it as far as perjury and other charges that can be filed against him if he's not being truthful, which is an accurate recitation of the law . . . .'' The prosecutor argued that nothing in the cooperation agreement stated that Bellavance's testimony was in fact truthful. The trial court overruled defense counsel's objection and admitted the agreement in its entirety.

After the trial court admitted the agreement, Bella-vance testified that the prosecutor had told him that he "[j]ust [had] to be honest and . . . tell the truth.'' On cross-examination, defense counsel asked Bellavance

State *v.* Flores

if the prosecutor in the present case, Louis J. Luba, Jr., was "the one [who's] going to let the sentencing court know about how your testimony went?" Bellavance replied in the affirmative. Attacking Bellavance's credibility further, defense counsel asked: "[B]ased [on] this agreement, your testimony could play a part [in] how your sentencing goes?" Again, Bellavance responded in the affirmative. He also answered in the affirmative when defense counsel asked him whether Luba would have "a lot of input" at his sentencing, whether he wanted to have Luba on his side, and whether he agreed that the better he looked to Luba, the more likely that was to happen. Defense counsel then asked Bellavance whether "it [is] safe to say you're also trying to be careful in not making yourself look too bad?" Bellavance responded: "No. I just spoke the truth."

The state's policy of committing all cooperation agreements to writing is relatively recent. In *Marquez* v. *Commissioner of Correction*, 330 Conn. 575, 198 A.3d 562 (2019), commenting on the state's "practice of informal, off-the-record leniency understandings with cooperating witnesses"; id., 603; this court encouraged prosecutors "to enter into a written cooperation agreement that memorializes the potential benefits that may ensue as a result of a cooperating [witness'] testimony." (Internal quotation marks omitted.) Id., 606–607. We noted with approval the practice of some trial courts "to make a clear record of the nature of the agreement or understanding, including the anticipated charge(s) and the maximum and minimum penalties for those charges." Id., 607. These cooperation agreements would protect against prosecutors' having "understandings"— often not with a witness, but with his counsel—whereby the state "suggest[s] . . . a favorable recommendation to the sentencing judge . . . in exchange for the witness' testimony inculpating another defendant." Id., 603–604. Both the prosecutor (to the court and to

State *v.* Flores

defense counsel) and the witness (to the jury) could then "den[y] that there is any actual 'agreement' or 'deal' . . . ." Id., 604. "These vague understandings can prevent defense counsel from effectively impeaching the witness for bias, perhaps leaving jurors with the impression . . . that [the witness did not have] any incentive to testify favorably for the state." (Internal quotation marks omitted.) Id. In reality, however, "counsel operating in a courthouse in which he or she is familiar with the practices of prosecutors and presiding judges can comfortably advise the witness of the possible credit that might follow from his testimony. Thus, these 'hypothetical' outcomes serve as a real incentive to motivate a witness to testify for the state." Id.; see also id., 611 (*Palmer, J.*, concurring) (because they are really no different from cooperation agreement, "such understandings, although informal and perhaps somewhat undefined, are no less a motivating factor for a cooperating witness than a more formal cooperation agreement").

"Left out of this equation, however, is the jury," we noted, which is "not well versed in the nuanced vagaries of such leniency agreements. Yet, we rely on jurors to assess a witness' credibility—including a witness' motivation to testify—while withholding from them critical information that would help them assess just how motivated that witness might be." Id., 604–605; see also id., 612 (*Palmer, J.*, concurring) ("it is well known that . . . cooperating witnesses in this state invariably receive significant consideration"). To combat any misimpressions these "understandings" might leave the jury with, we noted that defense counsel might be motivated to "explore other means to reveal to the jury a cooperating witness' motivation to testify," including retaining and offering testimony from an expert witness, who might educate the jury to these "nuanced vagaries . . . ." Id., 605–606. But "[t]his approach has

State *v.* Flores

its own disadvantages. In addition to increased costs, it leaves the jury to choose between competing experts without a framework from which to properly assess the significance of those experts' opinions.'' Id., 606; see also id., 613 (*Palmer J.*, concurring) (''if other approaches to identifying the true nature of that understanding are not undertaken by the state or the trial court, defense counsel may find it necessary to seek a jury instruction'' explaining benefits cooperating witness can expect to receive).

''To its credit, following our decision in *Marquez*, the Division of Criminal Justice voluntarily adopted a new policy, entitled '515 Cooperating Witnesses,' '' which requires cooperation agreements to be reduced to writing. *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 189 n.10, 243 A.3d 1163 (2020). Although the division has adopted a commendable policy, and one that we encouraged, that does not, *a fortiori*, make those agreements admissible in their entirety. Rather, a new concern arises when the state and a cooperating witness enter into an agreement that the state has drafted, virtually in its sole discretion, and the state then seeks to admit into evidence not only the fact of an agreement between the two, but also every word of that (at least arguably) self-serving document. Cf. *State* v. *Tony M.*, 332 Conn. 810, 829–30, 833–35, 213 A.3d 1128 (2019) (letter regarding plea negotiations written by defendant was not admissible, in part, because of concern defendant may use language framed with eye toward its self-serving use at trial).[6] Moreover, at least in the present case, the state sought to enter the agreement into evidence in its case-in-chief to inoculate its own witness against impeachment even before defense counsel challenged his credibility.

_____

[6] Although *Tony M.* involved concerns regarding the defendant's self-serving drafting of plea bargaining documents, this concern applies equally to cooperation agreements drafted solely by the state.

State *v.* Flores

We note initially that the defendant raises this argument as both an evidentiary and a prosecutorial impropriety claim. Both claims are premised on the argument that the truthfulness provisions of the cooperation agreement constitute improper vouching. We will upset a trial court's ruling on the admissibility of evidence only upon a showing of a clear abuse of the court's discretion. See id., 831. Because we hold as a matter of evidentiary law that the trial court did not abuse its discretion by admitting the truthfulness provisions of the cooperation agreement, we likewise hold that no impropriety occurred. Thus, the defendant's claim fails both as an evidentiary and a prosecutorial impropriety matter. See *State* v. *Taft*, 306 Conn. 749, 761–62, 51 A.3d 988 (2012) (claims of prosecutorial impropriety require analysis consisting of two separate and distinct steps: "(1) whether [the impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial" (internal quotation marks omitted)).

Although Connecticut appellate courts have not previously addressed the extent to which cooperation agreements are admissible as a matter of evidentiary law, other appellate courts have. The similarity between how the Federal Rules of Evidence and the Connecticut Code of Evidence treat evidence of truthfulness[7] leads us to look to federal case law for guidance. See, e.g., *State* v. *Favoccia*, 306 Conn. 770, 790–91, 51 A.3d 1002 (2012). The federal courts of appeals are divided on the issue of the admissibility of cooperation agreements and, in particular, provisions of those agreements obliging the witness to testify truthfully. The majority of

---

[7] Compare Fed. R. Evid. 608 (a) ("evidence of truthful character is admissible only after the [witness'] character for truthfulness has been attacked"), with Conn. Code Evid. § 6-6 (a) ("[e]vidence of truthful character is admissible only after the character of the witness for truthfulness has been impeached").

State *v.* Flores

federal appeals courts have held that provisions in cooperation agreements regarding truthfulness are admissible on direct examination of a witness, even prior to any challenge to the witness' credibility. See *United States* v. *Anderson*, 303 F.3d 847, 856 (7th Cir. 2002); *United States* v. *Tocco*, 200 F.3d 401, 416–17 (6th Cir. 2000); *United States* v. *Santana*, 150 F.3d 860, 863 (8th Cir. 1998); *United States* v. *Spriggs*, 996 F.2d 320, 323–24 (D.C. Cir.), cert. denied, 510 U.S. 938, 114 S. Ct. 359, 126 L. Ed. 2d 323 (1993); *United States* v. *Weston*, 960 F.2d 212, 215–16 (1st Cir. 1992); *United States* v. *Lord*, 907 F.2d 1028, 1031 (10th Cir. 1990); *United States* v. *Binker*, 795 F.2d 1218, 1223 (5th Cir. 1986), cert. denied, 479 U.S. 1085, 107 S. Ct. 1287, 94 L. Ed. 2d 144 (1987); *United States* v. *Oxman*, 740 F.2d 1298, 1302–1303 (3d Cir. 1984), vacated on other grounds sub nom. *United States* v. *Pflaumer*, 473 U.S. 922, 105 S. Ct. 3550, 87 L. Ed. 2d 673 (1985); *United States* v. *Henderson*, 717 F.2d 135, 137–38 (4th Cir. 1983), cert. denied, 465 U.S. 1009, 104 S. Ct. 1006, 79 L. Ed. 2d 238 (1984). These courts have adopted this approach because, although they recognize that "evidence concerning a plea agreement and its provisions may have both a bolstering and an impeaching effect on the [witness'] credibility";[8] *United States* v. *Lord*, supra, 1030; they also recognize that it is difficult for trial courts to distinguish between impeaching and bolstering provisions of a cooperation agreement. Id., 1030–31. As a result, these courts conclude that "introduction of this evidence enables the jury to more accurately assess the [witness'] credibility

[8] Specifically, "[c]ooperation agreements can undermine a witness' credibility by revealing a motive for the witness to tailor his testimony to satisfy the government to receive the benefits of the agreement while at the same time the witness' credibility can be bolstered by the presence of a cooperation agreement that can give the witness' testimony the appearance of having the government's stamp of approval. *United States* v. *Henderson*, supra, 717 F.2d 137; [see also] *United States* v. *Spriggs*, supra, 996 F.2d 324; *United States* v. *Lord*, supra, 907 F.2d 1030–31." *State* v. *Gentile*, 75 Conn. App. 839, 851–52, 818 A.2d 88, cert. denied, 263 Conn. 926, 823 A.2d 1218 (2003).

State *v.* Flores

. . . regardless of whether the defense intends to use the agreement to impeach the [witness'] testimony . . . .'' (Citations omitted.) Id., 1030.

By contrast, the United States Courts of Appeals for the Second and Eleventh Circuits have held that, although cooperation agreements may be admissible if relevant, only ''the impeaching aspects of cooperation agreements may be brought out in the government's direct examination of a witness who testifies pursuant to such an agreement.'' (Internal quotation marks omitted.) *United States* v. *Certified Environmental Services, Inc.*, 753 F.3d 72, 86 (2d Cir. 2014); see also *United States* v. *Knowles*, 66 F.3d 1146, 1161–62 (11th Cir. 1995), cert. denied sub nom. *Wright* v. *United States*, 517 U.S. 1149, 116 S. Ct. 1449, 134 L. Ed. 2d 568 (1996); *United States* v. *Cruz*, 805 F.2d 1464, 1479–80 (11th Cir. 1986), cert. denied, 481 U.S. 1006, 107 S. Ct. 1631, 95 L. Ed. 2d 204 (1987), and cert. denied sub nom. *Thomas* v. *United States*, 482 U.S. 930, 107 S. Ct. 3215, 96 L. Ed. 2d 702 (1987). ''[I]mpeaching aspects of cooperation agreements'' include ''the fact of the agreement and the [witness'] understanding of it, as a motivation for the witness to testify for the [g]overnment . . . .'' (Internal quotation marks omitted.) *United States* v. *Certified Environmental Services, Inc.*, supra, 86. The state, however, ''may not introduce the bolstering aspects of a cooperation agreement unless and until the [witness'] credibility has been questioned in ways that 'open the door' to the admission of the agreement.'' Id. ''This proposition stems from well established rules of evidence relating to relevance, hearsay, bias, completeness, and otherwise, that taken together, provide that absent an attack on the veracity of a witness, no evidence to bolster [the witness'] credibility is admissible.'' (Internal quotation marks omitted.) Id. Under this approach, truthfulness provisions are considered ''bolstering aspects of a cooperation agreement'' and, thus,

State *v.* Flores

are not admissible until the defendant attacks the witness' credibility. Id., 85–86. However, it is not reversible error "if testimony on the [truth telling] provisions of a [witness'] cooperation agreement has been improperly introduced before that [witness'] credibility has been challenged, but the defense challenges the [witness'] credibility later—for example, on cross-examination, or during closing arguments . . . ." *United States* v. *Williams*, 787 Fed. Appx. 8, 10 (2d Cir.), cert. denied,       U.S.      , 140 S. Ct. 645, 205 L. Ed. 2d 408 (2019); see also *United States* v. *Porges*, 80 Fed. Appx. 130, 132 (2d Cir. 2003). This minority approach is premised on the belief that, although cooperation agreements are " 'a double-edged sword' "; *United States* v. *Certified Environmental Services, Inc.*, supra, 85; overall, "the entire cooperation agreement bolsters more than it impeaches." (Emphasis omitted; internal quotation marks omitted.) Id., 86. The Second Circuit, however, has recognized that this approach creates difficulties, as it is sometimes not easy to draw the line between impeaching provisions and bolstering provisions, especially during trial. For this reason, the Second Circuit has stated that, "[w]ere we writing on a blank slate, we might have followed the other circuits that avoid the distinctions we have required judges and lawyers to make during the heat of trial." *United States* v. *Cosentino*, 844 F.2d 30, 33 n.1 (2d Cir.), cert. denied, 488 U.S. 923, 109 S. Ct. 303, 102 L. Ed. 2d 322 (1988).

Under either approach, however, truthfulness provisions contained in cooperation agreements are admissible, with the divide between circuits focused on when they are admissible—before or after the witness' credibility is attacked. Regardless, all circuits agree that these provisions may constitute improper vouching by the state, with their admissibility hinging on the precise language of the provision. "Improper vouching may occur when the government: (1) refers to facts outside

State *v.* Flores

the record or implies that the veracity of a witness is supported by outside facts that are unavailable to the jury; (2) implies a guarantee of truthfulness; or (3) expresses a personal opinion about the credibility of a witness.'' *United States* v. *Benitez-Meraz*, 161 F.3d 1163, 1167 (8th Cir. 1998). Under this definition, courts have explained that truthfulness provisions do not constitute impermissible vouching when they merely ''reveal that the witnesses had an obligation to testify truthfully and explain the consequences of a breach of that obligation.'' *United States* v. *Bowie*, 892 F.2d 1494, 1499 (10th Cir. 1990); see also *United States* v. *Winter*, 663 F.2d 1120, 1134 (1st Cir. 1981), cert. denied, 460 U.S. 1011, 103 S. Ct. 1250, 75 L. Ed. 2d 479 (1983), and cert. denied sub nom. *Goldenberg* v. *United States*, 460 U.S. 1011, 103 S. Ct. 1249, 75 L. Ed. 2d 479 (1983), and cert. denied sub nom. *Price* v. *United States*, 460 U.S. 1011, 103 S. Ct. 1250, 75 L. Ed. 2d 479 (1983). These provisions become impermissible vouching only when the prosecutor explicitly or implicitly indicates to the fact finder that he or she has verified the truth of the testimony presented to the fact finder. See *United States* v. *Certified Environmental Services, Inc.*, supra, 753 F.3d 86 (''while the [g]overnment may, after a [witness'] credibility is attacked, rehabilitate the witness using a cooperation agreement, it is well established that prosecutors may not [personally] vouch for their witnesses' truthfulness'' (internal quotation marks omitted)); *United States* v. *Suarez-Milian*, Docket Nos. 91-5158 and 91-5159, 1992 WL 252495, *8 (4th Cir. October 5, 1992) (decision without published opinion, 976 F.2d 728) (use of truthfulness portions of cooperation agreements becomes impermissible vouching only when prosecutors explicitly or implicitly indicate they can monitor and accurately verify truthfulness of witness' testimony). For example, a truthfulness provision in a cooperation agreement constitutes improper vouching

State *v.* Flores

if it includes a statement that the government has verified the accuracy of the witness' testimony. See *United States* v. *Certified Environmental Services, Inc.*, supra, 87 ("[T]he prosecutor personally vouched for the truthfulness of these witnesses, stating that 'the immunity agreements are very simple. We wanted to ensure that people taking the stand provided the truth.' "); *United States* v. *Bowie*, supra, 1498 (truthfulness portions of cooperation agreements become impermissible vouching when prosecutors explicitly or implicitly indicate they can monitor and accurately verify truthfulness of witness' statements); *United States* v. *DiLoreto*, 888 F.2d 996, 998 (3d Cir. 1989) (The defendants' convictions were vacated and the case was remanded for a new trial when the prosecutor had attempted to bolster the credibility of the state's cooperating witnesses by stating during closing rebuttal argument, "[w]e don't put liars on the stand. We don't do that." (Emphasis omitted; internal quotation marks omitted.)), overruled in part on other grounds by *United States* v. *Zehrbach*, 47 F.3d 1252 (3d Cir.), cert. denied, 514 U.S. 1067, 115 S. Ct. 1699, 131 L. Ed. 2d 562 (1995), and cert. denied sub nom. *Mervis* v. *United States*, 514 U.S. 1067, 115 S. Ct. 1699, 131 L. Ed. 2d 562 (1995); *United States* v. *Binker*, supra, 795 F.2d 1222–23 n.2, 1227 (portion of plea agreement stating that government had verified accuracy of witness' statement was inadmissible); *United States* v. *Roberts*, 618 F.2d 530, 533–34 (9th Cir. 1980) (statement that detective was in courtroom monitoring truthfulness of witness' testimony was inadmissible). Admitting these truthfulness provisions also constitutes vouching if they refer to facts not in evidence or offer the prosecutor's personal opinion of the truthfulness of the witness' testimony. See, e.g., *United States* v. *Lettig*, 209 Fed. Appx. 832, 840–41 (10th Cir. 2006); *United States* v. *Dadanian*, 818 F.2d 1443, 1445 (9th Cir. 1987), modified, 856 F.2d 1391 (9th Cir. 1988).

State *v.* Flores

We need not decide today whether to follow the majority or the minority of jurisdictions regarding whether the admission of the agreements and their truthfulness provisions must await an attack on the witness' credibility because the trial court did not abuse its discretion under either approach in the present case. Before trial, defense counsel alerted the state and the trial court that he would indeed be attacking Bellavance's credibility and did so on cross-examination, suggesting that Bellavance was motivated to testify dishonestly in the state's favor in the hope that the state would support a reduced sentence for him at his sentencing. Thus, under the majority approach, the timing of the admission of the truthfulness provisions was proper, and, under the minority approach, although these provisions were admitted before the defendant attacked Bellavance's credibility, there was no harm because they would have been admissible later during the state's redirect examination of Bellavance. See, e.g., *United States* v. *Williams*, supra, 787 Fed. Appx. 10.

Nevertheless, the defendant argues that the trial court should not have admitted these particular truthfulness provisions contained in Bellavance's cooperation agreement because they implied that the state was vouching for the Bellavance's credibility. Two of the three truthfulness provisions at issue, however, are similar to the kind of provisions considered permissible in the federal case law discussed and cited previously—specifically, the provisions stating that Bellavance had a duty to "truthfully disclose" and "truthfully testify" and that he may be charged with perjury if he lies. Under applicable case law, these provisions do not constitute impermissible vouching because they do not refer to facts not in evidence, do not explicitly or implicitly indicate that the state has verified the accuracy of the testimony, and do not offer the prosecutor's personal opinion regarding the truthfulness of the testimony. Rather, these provi-

State *v.* Flores

sions merely state that Bellavance had an obligation to testify truthfully—a duty all witnesses are sworn to uphold—and explain the consequences for a breach of that obligation. We do not rule out the possibility that gratuitous references to the threat of perjury may constitute improper vouching under certain circumstances, but this concern does not arise in the present case.

One provision of the parties' agreement in this case requires that we undertake a closer examination, however, and that trial judges do the same in future cases. That provision states: "[A]t the time of sentencing the [s]tate's [a]ttorney's [o]ffice will make known to the sentencing court the nature, extent, value, *and truthfulness* of the witness' information and testimony." (Emphasis added.) The state does not distinguish this provision from any of the other "truthfulness" provisions in the agreement, arguing only that the provisions as a whole "did no more than reveal" that Bellavance had an obligation to testify truthfully and the consequences of breaching that obligation. According to the state, the provision at issue merely "provid[ed] the jury with a full picture of Bellavance's agreement . . . ." "Would that it 'twere so simple." Hail, Caesar! (Universal Pictures 2016).

To the contrary, this provision comes much closer to suggesting, "explicitly or implicitly," that prosecutors "can monitor and accurately verify the truthfulness of the witness' testimony." *United States* v. *Bowie*, supra, 892 F.2d 1498. It comes very close to impermissibly suggesting to the jury that the prosecutor has access to tools or information not available to the jury that the prosecutor will use to ensure that the witness tells the truth. Such an implication is improper, even when made subtly or indirectly. Nonetheless, we recognize that this provision also can be understood to suggest that the prosecutor would be the final arbiter of truth— that is, that the prosecutor would decide the truthful-

State *v.* Flores

ness of Bellavance's testimony and, then, at the time
of Bellavance's sentencing, inform the sentencing judge
whether he believed that Bellavance had been truthful,
despite the fact that the prosecutor has no more infor-
mation about Bellavance's truthfulness than the jury.
Such a reading would weaken Bellavance's credibility
by suggesting that Bellavance remains at the mercy of
the prosecutor. This provision does not suggest, how-
ever, that the prosecutor explicitly or implicitly indi-
cated to the jury that he had verified the truth of the
testimony presented to the jury. At the time of the
defendant's trial, there remained the possibility that
Bellavance might testify in a manner that the prosecutor
deemed dishonest and not receive the benefit of the
cooperation agreement. Nothing in the cooperation
agreement suggested that the prosecutor *already* had
verified the truth of Bellavance's testimony. Rather, the
cooperation agreement's language left the determina-
tion of the truthfulness of Bellavance's testimony to the
jury, with the state's role in determining credibility not
arising until Bellavance's sentencing hearing. Thus,
although it would have been better if this particular
reference to truthfulness had been omitted—and
although we believe that, in the future, the state should
avoid such language—we stop short of concluding that
the trial court abused its discretion in admitting that
portion of the cooperation agreement.

Nevertheless, we note that, if not carefully drafted
by the state and addressed by the trial court, such provi-
sions may lead a jury to infer not only that the prosecu-
tor will monitor and ultimately verify the truthfulness
of the cooperating witness' testimony before the sen-
tencing court, but also that, at the time of the testimony,
the prosecutor believes the cooperating witness' testi-
mony is truthful. Ethically, of course, the state could
not knowingly put on testimony it thought to be untrue;
see Rules of Professional Conduct 3.3 (a) (3); and it

State *v.* Flores

certainly would not contract for testimony it knew was false. But the implication that the prosecutor knows, or has the ability to determine, whether the witness is telling the truth must be avoided.

It is not inconsistent, however, to observe that, from the perspective of the now cooperating and testifying witness addressing his testimony to the trier, the "truth" is not the only consideration supporting the agreement. In most instances, of course, a cooperating witness either already has provided a police statement (as Bellavance did in the present case), or he or his counsel has proffered his intended testimony to the state. The state can maintain that it has bargained only for the truth and deny that the essence of the bargain supporting the agreement is that the witness testify consistent with that earlier statement or proffer. But then, as in *Marquez*, the jury is no better informed than when we deny that the state and the witness have an "agreement," but only an "understanding." Jurors are "not well versed in the nuanced vagaries of such leniency agreements. Yet, we rely on jurors to assess a witness' credibility— including a witness' motivation to testify—while withholding from them critical information that would help them assess just how motivated that witness might be." *Marquez* v. *Commissioner of Correction*, supra, 330 Conn. 605. The challenge for counsel and the court is to help the jury with these nuanced vagaries.

By introducing such agreements, in whole or in part, that contain provisions that explicitly or implicitly indicate that the prosecutor can monitor and accurately verify the truthfulness of the witness' testimony, the state invites the defendant to conduct a vigorous cross-examination, as in the present case: about the terms of the agreement, who drafted it, who would enforce it, and the witness' motivation for entering into the agreement. It might be that, in most cases, this constitution-

State *v.* Flores

ally protected right will suffice to protect the defendant, while also advancing the truth-seeking function.

As we noted in *Marquez*, however, defense counsel might seek to combat any misimpressions by "explor[-ing] other means to reveal to the jury a cooperating witness' motivation to testify" id., 606; including offering expert testimony to educate the jury about the "nuanced vagaries" of cooperation agreements. Id., 605. This approach increases the costs of litigation and can potentially reduce the case to a swearing contest between competing experts. Id., 606. A defendant also might ask a court to design a jury charge on the issue of how cooperation agreements are struck or ask a court to specifically instruct the jury that the fact that the cooperating witness entered into a cooperation agreement with the state does not ensure the credibility of the testimony. See id., 613 (*Palmer J.*, concurring).

In the end, ensuring that any mention of a cooperation agreement—and more specifically, any mention of "truthfulness" or its equivalent in that agreement—is fairly portrayed to a jury is a task we are confident can be managed by vigilant trial judges, mindful of the circumstances and evidence at issue. We also must trust prosecutors to avoid overreaching by drafting and introducing documents loaded with self-serving terms in a manner that amounts to improper vouching. We caution the state, however, that, both in any cooperation agreement and in any argument before the jury regarding that agreement, the state must not insinuate to the jury that it has verified the testimony placed before the jury or that it is in a position to monitor and accurately verify the witness' testimony. To the extent that a cooperation agreement includes terms or provisions that constitute improper vouching, that needlessly include "[r]epeated references to the [witness'] obligation to tell the truth"; *Commonwealth* v. *Ciampa*, 406 Mass. 257, 262, 547 N.E.2d 314 (1989); or that are otherwise gratuitous or

State *v.* Flores

irrelevant, including gratuitous references to the threat of perjury, trial courts can and should address these concerns by appropriate redactions.

III

Last, the defendant launches a multipronged attack on the jury's findings, claiming that there was insufficient evidence to prove beyond a reasonable doubt that he committed the crimes of (1) attempt to commit robbery in the first degree, (2) home invasion predicated on attempt to commit robbery in the first degree, (3) burglary in the first degree, (4) home invasion predicated on burglary in the first degree, and (5) conspiracy to commit home invasion. We disagree with each of the defendant's sufficiency arguments.

The evidence supporting each of the defendant's challenged convictions can be summarized as follows. In its case-in-chief, the state offered testimony from all four victims and Bellavance, as well as testimony regarding the defendant's written statement to the police. Bellavance testified that the defendant had approached him about stealing money and drugs from the defendant's drug dealer and that he had agreed. The defendant asked him if he could get a gun. Bellavance said no. According to Bellavance, the defendant then asked him if he could get other tools or equipment, specifically, box cutters, zip ties, a machete, gloves and duct tape. Bellavance agreed and obtained these items. Bellavance testified that he and the defendant specifically had discussed what they would do if they encountered residents who would not comply with their demands, agreeing to "tie them up" and "do whatever [was] necessary" to "force them" to comply. According to Bellavance, the defendant stated that he was willing to "do whatever [was] necessary" to obtain the money and drugs, including using force. The defendant also

State *v.* Flores

told Bellavance that he intended to leave for California after they stole the money and drugs.

As to the incident itself, Bellavance testified that, once he had acquired all the tools and had ingested cocaine, he drove the defendant to Daniel's house. As they approached the house, the defendant told Bellavance to park about one mile away. The defendant and Bellavance then walked toward Daniel's house, with Bellavance carrying the machete and both men taking turns carrying a black duffel bag containing the acquired tools. Upon approaching the house, they saw lights on in the front of the residence and a couple of vehicles in the driveway, and the defendant told Bellavance that one of the vehicles belonged to Daniel. Thus, the defendant and Bellavance assumed that Daniel was home. As a result, Bellavance testified, they decided to enter through the back of the house where there was a door leading to the basement. According to Bellavance, the defendant asked him to kick down the door, but he declined, so the defendant kicked it down. The two men then entered the basement with Bellavance holding the machete and duffel bag. Bellavance testified that, just as he entered Daniel's bedroom, he heard footsteps coming down the basement stairs. Three men came down the basement stairs and stopped in their tracks when they saw Bellavance holding the machete. Bellavance testified that one of the men asked them what they were going to do but that he and the defendant did not respond. Bellavance and the defendant then ran out of the residence and hid in the nearby woods until the police apprehended them.

Through Mazzarella, the state offered into evidence the defendant's written statement to the police, which was read into the record.[9] The statement was consis-

_____

[9] "On [December 12, 2017], me and Ben [Bellavance] drove to [Daniel's] house in Woodstock. We went there to get marijuana and money. I had seen that [Daniel (Dan)] had gotten arrested for drugs on [local radio station] WINY, so I knew he was a good score. I also knew Dan before because I

State *v.* Flores

tent[10] with Bellavance's testimony except that the defendant stated that he and Bellavance never intended to hurt anyone.

Raymond Jr. testified that, on the night of the incident, he heard a loud bang and followed his sons down the basement stairs to see what had happened. In the basement, he saw two individuals wearing masks. He stated that one of the intruders, whom he identified as Bellavance, was holding a machete and a backpack. He testified that the other intruder, the defendant, also "appeared to have a weapon in his hand" that was "[s]ome type of knife" or "something else sharp . . . ."

Similarly, Raymond III testified that, after hearing a loud bang and running downstairs to the basement, he

---

used to buy marijuana off of him. Ben picked me up at my house at almost 7:00 [p.m.] or so in his red Mini Cooper and I told him how to get to Dan's house. I don't think that Ben had met Dan before today. I guess that he just wanted to get some extra money. We parked on a road a ways from Dan's house and walked on the road until we got there. When we arrived at his house I knew that Dan was there because I saw that Dan was there because I saw his car in the driveway. I also noticed that there were two other vehicles in the driveway as well. At [Dan's] house I kicked the door in. We walked into the house and went into [Dan's] room, which was in the basement, which I knew because I had been to his house before. Dan was not in his room. We did not know that it was his parents house, and we made [too] much noise and they came out and started yelling at us and we ran. There was no fighting just yelling. Ben carried the bags of things we had in case we needed them. The machete and everything was [Ben's], he had said that he would grab a bag with whatever he'd need before we left. I only carried a box cutter. We had the items in the bag in case we needed them to tie Dan up. We never had any intention of hurting [Dan] or anyone else we only went there to get money and drugs. Once we started running we ran on the road a little and then went into the woods when we saw a car coming."

[10] In his statement, the defendant admitted that he and Bellavance went to Daniel's house to steal money and drugs, that they parked down the road from Daniel's residence, that the defendant saw Daniel's vehicle in the driveway and knew he was home, that the defendant kicked in the basement door and entered the basement, that the defendant carried a box cutter, that he and Bellavance had items in a bag with which to tie up Daniel, if needed, and that the defendant and Bellavance encountered residents and fled the scene.

State *v.* Flores

saw two men wearing masks. He stated that one of the men was holding a knife and, when he asked what they were going to do, the man holding the knife responded by raising it. Raymond III explained that, when he repeated his question, the men, who remained silent, ran away through the basement door. Daniel's testimony was consistent with the testimony of Raymond III. Additionally, Raymond III testified that he had known the defendant before the incident at issue and recognized him during the incident but could not remember his last name at that time.

The defendant testified in his own defense. He stated that he and Bellavance simply wanted to get drugs and money and had no plan to hurt or tie up anyone. Asked what he intended to do if someone was home, the defendant stated that, "if we would have known there was somebody home, we wouldn't go in there." The defendant testified, contrary to Bellavance's testimony, that he thought no one was home because it was dark outside. He explained that he intended to use the box cutter to cut into drywall because he believed that Daniel hid his money in the power outlets. He also stated that he kept the box cutter in his pocket during the entire incident. He further testified that he did not know what was in the black duffel bag, including the zip ties. On cross-examination, however, he admitted that he previously had conceded that everything in his statement to the police was accurate.

"When reviewing a sufficiency of the evidence claim, we do not attempt to weigh the credibility of the evidence offered at trial, nor do we purport to substitute our judgment for that of the jury. . . . [W]e construe the evidence in the light most favorable to sustaining the verdict . . . [and] determine whether the jury reasonably could have concluded that the evidence established the defendant's guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Haugh-*

State *v.* Flores

*wout*, 339 Conn. 747, 765, 262 A.3d 791 (2021). We briefly address each of the defendant's insufficiency claims in turn, none of which has merit.

A

The defendant claims that there was insufficient evidence to convict him of attempt to commit robbery in the first degree[11] because (1) there was no evidence that he intended to use or threaten to use force, and (2) there was no evidence that he actually used or threatened the use of a dangerous instrument.[12] We disagree.

Section 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." The attempted crime in the present case is robbery in the first degree under § 53a-134 (a) (3). Specifically, the information charged in relevant part that, in the course of committing a larceny with the intent to deprive another person of property, the defendant used or threatened the use of a dangerous instrument on another person for the purpose of compelling such person to deliver property.[13]

[11] As attempt to commit robbery was the predicate crime to the defendant's home invasion conviction, he also challenges the sufficiency of the evidence to convict him of home invasion. Because we conclude that there was sufficient evidence to convict the defendant of attempt to commit robbery, this claim likewise fails.

[12] To the extent that the defendant also argues that there is no evidence that the box cutter constituted a dangerous instrument. we address this argument in part III B of this opinion because the term "dangerous instrument" under both §§ 53a-134 (a) (3) and 53a-101 (a) (1) is subject to the same definition under § 53a-3 (7).

[13] Robbery in the first degree under § 53a-134 (a) occurs when, "in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, [the defendant] or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ."

State *v.* Flores

As to his specific intent, the defendant more specifically argues that the state had to prove beyond a reasonable doubt both that he intended to commit a larceny and that he intended to do so through the use or threatened use of force. The defendant's argument misconstrues the language of the relevant statutes. "[T]he specific intent required to prove an attempted robbery is no different from the specific intent required to commit a robbery . . . ." (Internal quotation marks omitted.) *State* v. *Henderson*, 173 Conn. App. 119, 133, 163 A.3d 74 (2017), aff'd, 330 Conn. 793, 799, 201 A.3d 389 (2019). "To prove that a defendant is guilty of robbery [under § 53a-134 (a) (3)], the state must prove that the defendant had the specific intent to commit a larceny and that the larceny was committed through the use or threatened use of force. . . . [T]he intent element of robbery relates to the commission of the larceny and not to the use or threatened use of physical force." (Internal quotation marks omitted.) Id. Thus, the state was not required to establish beyond a reasonable doubt that the defendant intended to use or threaten the use of force.

As to his actual use or threatened use of a dangerous instrument, the defendant argues that there was evidence only that he had a box cutter in his pocket during the incident at issue, and, thus, he only possessed the box cutter and did not actually use or threaten its use.

General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

A defendant commits larceny under General Statutes § 53a-119 "when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner."

State *v.* Flores

Although the defendant is correct that, to be convicted of robbery in the first degree under § 53a-134 (a) (3), the state must establish beyond a reasonable doubt that he actually used or threatened to use a dangerous instrument; see *State* v. *Nicholson*, 71 Conn. App. 585, 591–92, 803 A.2d 391, cert. denied, 261 Conn. 941, 808 A.2d 1134 (2002); the defendant was only charged with and convicted of attempt to commit robbery. "Under General Statutes § 53a-49 (a) (2), [a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he . . . intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. The act or acts must be something more than mere preparation for committing the intended crime; they must be at least the start of a line of conduct which will lead naturally to the commission of a crime which appears to the actor at least to be possible of commission by the means adopted. . . . Furthermore, the actor's intent can be inferred from his or her verbal or physical conduct and the surrounding circumstances. . . . [T]he attempt is complete and punishable, when an act is done with intent to commit the crime, which is adapted to the perpetration of it, whether the purpose fails by reason of interruption . . . or for other extrinsic cause." (Citations omitted; internal quotation marks omitted.) *State* v. *Anderson*, 211 Conn. 18, 27, 557 A.2d 917 (1989). The defendant was required only to take a substantial step in using or threatening the use of the box cutter to be convicted of attempt to commit robbery. See, e.g., *State* v. *Daniel B.*, 331 Conn. 1, 15, 201 A.3d 989 (2019); *State* v. *Carter*, 317 Conn. 845, 856, 120 A.3d 1229 (2015); *State* v. *Holliday*, 85 Conn. App. 242, 248, 856 A.2d 1041, cert. denied, 271 Conn. 945, 861 A.2d 1178 (2004).

State *v.* Flores

In the present case, there was testimony that the defendant asked Bellavance to bring weapons (first a gun and then the box cutters and machete); that he stated that would tie up and do whatever it took, including using force, to get money and drugs; that he kicked down the victims' backdoor knowing that at least one person was home; and that he possessed a box cutter. Most important, there was testimony from Raymond Jr. that the defendant held a knife or sharp object, which the jury reasonably could have inferred to refer to the box cutter. Even if we assume that this testimony was insufficient to establish that the defendant actually used or threatened the use of the box cutter as a dangerous instrument, it was sufficient to establish that the defendant took a substantial step in using or threatening the use of the box cutter. Accordingly, there was sufficient evidence for the jury to find the defendant guilty of attempt to commit robbery in the first degree.

B

The defendant also claims that there was insufficient evidence to convict him of burglary in the first degree[14] because there was no evidence that the box cutter he possessed constituted a dangerous instrument. Specifically, he argues that there was no evidence that he used or attempted to use the box cutter in circumstances that its use or threatened use was capable of causing death or serious physical injury because the evidence showed that he kept the box cutter in his pocket and that he intended to use it only to cut through drywall.

Section 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when (1)

---

[14] The defendant also claims that there was insufficient evidence to convict him of home invasion premised on burglary in the first degree. He argues that, because there was insufficient evidence to convict him of first degree burglary, there likewise was insufficient evidence to convict him of home invasion, as burglary was the predicate crime. Because we conclude that there was sufficient evidence to convict the defendant of first degree burglary, this claim likewise fails.

State *v.* Flores

such person enters or remains unlawfully in a building with intent to commit a crime therein and is armed with explosives or a deadly weapon or dangerous instrument . . . .'' Section 53a-3 (7) defines dangerous instrument as "any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . .''[15] "Although it is not necessary under this definition that any physical injury actually have been inflicted . . . it is necessary that under the circumstances in which [the instrument was] used or attempted or threatened to be used, it was capable of causing death or serious physical injury.'' (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Grant*, 177 Conn. 140, 146, 411 A.2d 917 (1979). "[T]he analysis focuses on the actual circumstances in which the instrument is used in order to consider the instrument's potential to cause harm. . . . The statute neither restricts the inquiry to the exact manner in which the object was actually used, nor requires any resulting serious physical injury. . . . The facts and circumstances [must] show only that the general way in which the object was used could potentially have resulted in serious physical injury. . . . The object's potential for injury, therefore, must be examined only in conjunction with the circumstances in which it is actually used or threatened to be used, and not merely viewed in terms of its dangerous capabilities in the abstract. . . . Ordinary objects that are used in ways that would likely cause death or serious physical injury can constitute dangerous instruments.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Schultz*, 100 Conn. App. 709, 721–22, 921 A.2d 595, cert. denied, 282 Conn. 926, 926 A.2d 668 (2007).

---

[15] "Serious physical injury" is defined as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . .'' General Statutes § 53a-3 (4).

State *v.* Flores

The defendant concedes that, under § 53a-101 (a) (1), the state had to prove beyond a reasonable doubt only that he was armed with a dangerous instrument, not that he used or displayed a dangerous instrument. See *State* v. *Anderson*, 178 Conn. 287, 294, 422 A.2d 323 (1979) ("Actually, 'armed' is commonly interpreted as simply requiring that a weapon be in one's possession. . . . It is apparent that it is not necessary for a weapon to be exhibited, displayed, utilized or referred to in order for one to be considered 'armed.' " (Citations omitted.)); *State* v. *Owens*, 39 Conn. App. 45, 54, 663 A.2d 1108 ("it was possible to be armed without threatening the use of a weapon"), cert. denied, 235 Conn. 927, 667 A.2d 554 (1995). Nevertheless, he argues that, under § 53a-3 (7), for the box cutter to constitute a dangerous instrument, there must be evidence from which the jury reasonably could infer that he used or attempted to use it in circumstances such that its use or threatened use was capable of causing death or serious physical injury. He contends that there was no such evidence because he did not brandish, show, or use the box cutter. The defendant is correct that, although § 53a-101 (a) (1) does not require the use or threatened use of force per se, the state nonetheless is required to show that the instrument is dangerous under § 53a-3 (7), which may be done through evidence of actual circumstances. This court has explained, however, that for an instrument to constitute a dangerous instrument under § 53a-3 (7), we do not consider the way in which the instrument was "actually used" but only "the actual circumstances"; (emphasis omitted) *State* v. *Jones*, 173 Conn. 91, 97, 376 A.2d 1077 (1977); in which it was "used or attempted or threatened to be used"; (internal quotation marks omitted) id., 95; "to determine its potential as an instrument of death or serious physical injury." Id., 97.

In the present case, the jury reasonably could have found that, under the circumstances, the defendant

344 Conn. 713     SEPTEMBER, 2022     763

State *v.* Flores

used or attempted to use a box cutter, which was capable of causing death or serious physical injury, when he (1) asked Bellavance to procure weapons, including a gun, a machete, and box cutters; (2) stated that he would do whatever it took, including using force and tying up the residents, to obtain the money and drugs; (3) kicked down the backdoor of the residence at night knowing people were home; and (4) was holding the box cutter when he encountered the residence.[16] Additionally, the jury was free to disbelieve the defendant's testimony that he did not intend to harm anyone, that he intended to use the box cutter only to cut into drywall, and that he kept the box cutter in his pocket during the course of the entire incident. See, e.g., *State* v. *Hughes*, 341 Conn. 387, 400, 267 A.3d 81 (2021). Accordingly, there was sufficient evidence that the defendant was armed with a dangerous instrument.

C

The defendant claims that there was insufficient evidence to convict him of conspiracy to commit home invasion premised on attempt to commit robbery in the first degree because the evidence showed that he and Bellavance agreed only to enter the home and to commit larceny, not to enter the home and to use or threaten the use of physical force against another person for the purpose of compelling them to deliver property. Although for attempt to commit robbery in the first degree, the state did not have to prove beyond a reasonable doubt that the defendant had the specific intent to use or threaten the use of force—only the specific intent to commit a larceny—this court has explained that "[c]onspiracy is a specific intent crime, with the

_____

[16] In light of Raymond Jr.'s testimony that he saw the defendant holding a sharp object or knife, we need not determine whether there would have been sufficient evidence for the jury to find that the box cutter constituted a dangerous instrument if it remained in his pocket during the course of the burglary.

State *v.* Flores

intent divided into two elements: [1] the intent to agree or conspire and [2] the intent to commit the offense [that] is the object of the conspiracy. . . . Thus, [p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense.''[17] (Emphasis omitted; internal quotation marks omitted.) *State* v. *Pond*, 315 Conn. 451, 460, 108 A.3d 1083 (2015). As a result, specific intent is required for every element of home invasion,[18] including, in this case, the predicate felony of robbery in the first degree under § 53a-134 (a) (3).

In challenging the sufficiency of the evidence from which the jury reasonably could conclude that he and Bellavance agreed to enter Daniel's home and to commit a larceny through the use or threatened use of physical force, the defendant relies on his own testimony that he did not intend to hurt anyone, that he and Bellavance never discussed or agreed to use force, that he did not know anyone was home, that the box cutter remained in his pocket during the incident, and that he intended to use the box cutter only to cut through drywall. The jury, of course was not required to credit his testimony. See, e.g., *State* v. *Hughes*, supra, 341 Conn. 400.

Rather, the jury was entitled to credit Bellavance's testimony that he and the defendant agreed to enter

[17] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[18] General Statutes § 53a-100aa (a) provides in relevant part: "A person is guilty of home invasion when such person enters or remains unlawfully in a dwelling, while a person other than a participant in the crime is actually present in such dwelling, with intent to commit a crime therein, and, in the course of committing the offense: (1) Acting either alone or with one or more persons, such person or another participant in the crime commits or attempts to commit a felony against the person of another person other than a participant in the crime who is actually present in such dwelling . . . ."

State *v.* Flores

the house to steal money and drugs and that, if any
residents resisted, the defendant would tie them up and
do whatever was necessary to force them to comply.
Bellavance stated that the defendant asked him to
gather a machete, several box cutters, zip ties, chisels,
and duct tape. Additionally, the defendant himself testi-
fied that he traveled to Daniel's house at night, parked
approximately one mile away, walked to the house car-
rying a box cutter and the bag of items obtained by
Bellavance, knew that Bellavance had a machete, and
kicked in the basement door despite knowing at least
one resident was home. The defendant admitted much
of the same in his written statement to the police,
including that the items in the bag would be used in
case they needed to tie up Daniel. Finally, Raymond Jr.
testified that the defendant was holding a sharp object
or knife, which the jury reasonably could infer to have
referred to the box cutter. Accordingly, there was suffi-
cient evidence for the jury to find the defendant guilty
of conspiracy to commit home invasion predicated on
attempt to commit robbery in the first degree.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and MULLINS,
KAHN and KELLER, Js., concurred.

McDONALD, J., with whom ECKER, J., joins, concur-
ring. I agree with part I of the majority opinion, in which
the majority determines that the trial court correctly
concluded, under the current framework set forth in
General Statutes § 54-1o, that the state established by
a preponderance of the evidence that the defendant's
statement was both voluntary and reliable and, there-
fore, admissible, despite the remarkable failure of the
police to preserve the recording of the defendant's cus-
todial interrogation. I write separately to emphasize that
§ 54-1o is ostensibly intended to provide meaningful

State *v.* Flores

protections for individuals who are suspected of serious criminal conduct when the police fail to record their custodial interrogation by making statements made during such interrogations presumptively inadmissible at any future trial. In reality, however, § 54-1o provides largely illusory protections insofar as the state is able to overcome the presumption of inadmissibility by a mere preponderance of the evidence and will often rely on the testimony of the very law enforcement officials who failed to record the custodial interrogation to overcome the presumption of inadmissibility. If I correctly understand the legislature's objective in passing the statute, it should address the reality that a "presumption" that can be scuttled by a quantum of evidence no greater than a "preponderance of the evidence" is effectively no presumption at all. General Statutes § 54-1o (h). In my view, if the legislature intended for § 54-1o to provide meaningful protections for individuals being interrogated by law enforcement, while at the same time providing procedural consequences for law enforcement's failure (whether intentional, reckless or negligent) to record these crucial interviews, the legislature should consider amending § 54-1o to provide more meaningful protections to those individuals. The legislature could do so by simply requiring a heightened standard of proof—clear and convincing evidence—to overcome the presumption of inadmissibility, particularly if the evidence of reliability is being offered by the very law enforcement personnel who failed to conform their own conduct to the statutory mandate of recording the interrogation so that the substance of the questions and the manner in which they were being asked, as well as the individual's responses, would be preserved for later review by the state, defense counsel and the fact finder at any trial. Additionally, the legislature may wish to consider requiring ameliorative measures when the state overcomes the presumption of inadmissibility,

State *v.* Flores

including a jury instruction that would alert the jury to the fact that the police did not comply with the recording mandate of the statute or, as in this case, that the police recorded the interrogation and then destroyed that recording by recording over it.

I agree with parts II and III of the majority opinion. Accordingly, I respectfully concur. I begin with this state's recording statute, § 54-1o. Section 54-1o provides that, if a person suspected of having committed one of several enumerated classes of serious felonies gives a statement to law enforcement as a result of a custodial interrogation at a detention facility, the statement will be presumed to be inadmissible unless officers make an audiovisual recording of the interrogation. See General Statutes § 54-1o (b). Under subsection (h) of the statute, the state may overcome the presumption of inadmissibility in any case by proving, by a preponderance of the evidence, that the statement "was voluntarily given and is reliable, based on the totality of the circumstances." General Statutes § 54-1o (h).

The legislative history of § 54-1o reveals that the legislature was concerned with involuntary and untrustworthy confessions, and that it considered the recording requirement in § 54-1o to be an important step toward ensuring the reliability of confessions. See 54 H.R. Proc., Pt. 28, 2011 Sess., p. 9481, remarks of Representative Gary Holder-Winfield ("[M]ost false confessions stemming from an interrogation . . . come from the fact that there may be some intimidation, threats or coercion. This [b]ill seeks to put in place [an audiovisual] recording of the interrogation such that we can capture and see whether . . . those threats, coercions or intimidations happen[ed]."); see also 54 S. Proc., Pt. 16, 2011 Sess., pp. 5111–12, remarks of Senator Eric D. Coleman ("[S]ome of the flaws and shortcomings in our criminal justice system have to do with . . . the voluntariness and the validity of statements and confessions of [an]

State *v.* Flores

accused [which] oftentimes is suspect and has come into question. I believe that the bill before us would be a significant step in [the] direction of . . . contributing to a greater reliance [on] the confessions of individuals who are involved in custodial interrogation. . . . I believe that the recording of custodial interrogations will not only help the accused but, in fact, [when] those confessions and those statements are valid, the recording of them will serve as significant evidence of that fact.'').

This court similarly has emphasized the importance of recording custodial interrogations. For example, in his concurrence in *State* v. *Lockhart*, 298 Conn. 537, 4 A.3d 1176 (2010), Justice Palmer explained that we have become increasingly aware that false confessions, despite being counterintuitive, occur with some regularity; see id., 590–91 (*Palmer, J.*, concurring); and that "a recording requirement would dramatically reduce the number of wrongful convictions due to false confessions . . . .'' Id., 595 (*Palmer, J.*, concurring). Moreover, this court recently has stated that "[s]uch recordings enable the fact finder to view the circumstances of the interrogation for himself or herself and provide strong evidence to determine both the voluntariness and reliability of a defendant's statement.'' *State* v. *Christopher S.*, 338 Conn. 255, 282 n.9, 257 A.3d 912 (2021).

To encourage compliance with the recording requirement, § 54-1o (b) creates a presumption of inadmissibility when law enforcement fails to comply with the provisions of the statute. As we have explained, "[t]he pre-sumption of inadmissibility under § 54-1o is designed to encourage the police to record custodial interrogations by creating a consequence for their failure to do so. As we noted in *State* v. *Lockhart*, supra, 298 Conn. 537, one of the benefits of recording is to avoid the 'swearing contests' between law enforcement and defendants regarding what happened in the interrogation room. . . . Id., 566. When officers fail to record,

State *v.* Flores

we return to that paradigm.'' *State* v. *Christopher S.*, supra, 338 Conn. 290.

Section 54-1o (h), however, makes the failure to record custodial interrogations little more than an inconvenience for the state because the presumption of inadmissibility may be overcome if the state can demonstrate, by a mere preponderance of the evidence, that the statement was voluntary and reliable.[1] Indeed, during a public hearing on the bill, a representative of the Connecticut Criminal Defense Lawyers Association expressed concern that subsection (h) of § 54-1o is ''problematic because it seems to be a subsection on which prosecutors could easily rely to gain admittance of a statement that has not been recorded.'' Conn. Joint Standing Committee Hearings, Judiciary, Pt. 7, 2011 Sess., p. 1964. Similarly, Representative David A. Baram remarked that the statute ''indicates that evidence is presumed to be inadmissible unless it is video recorded, and then [subsection (h)] overcomes that presumption by a preponderance of the evidence . . . .'' Conn. Joint Standing Committee Hearings, Judiciary, Pt. 6, 2011 Sess., p. 1794. He went on to ask the following question:

---

[1] This is not the only perceived deficiency that this court has encountered in cases involving § 54-1o. Pursuant to the statute, a custodial interrogation is required to be recorded only when it occurs at a ''place of detention . . . .'' General Statutes § 54-1o (b). Subsection (a) (4) defines ''place of detention'' as ''a police station or barracks, courthouse, correctional facility, community correctional center or detention facility . . . .'' General Statutes § 54-1o (a) (4). Such a cramped understanding of ''place of detention'' fails to account for situations in which law enforcement engages in custodial interrogations in other coercive environments that may raise the same concerns as custodial interrogations in police stations, courthouses, or correctional facilities. For example, in *State* v. *Tony M.*, 332 Conn. 810, 213 A.3d 1128 (2019), the police interrogated the defendant in his hospital room while he was physically restrained to his hospital bed. See id., 818 and n.4, 826–27. Certainly, this, and other situations, including interrogations in police vehicles or other places where the individual is not free to leave, raise similar concerns regarding the possibility of intimidation, threats or coercion during the interrogation that the recording requirement is meant to guard against. Section 54-1o, however, provides no protections in these situations.

State *v.* Flores

"[W]ould anything really change if a police department for lack of training . . . [or] lack of funds decided to rely on established methods of interrogation *without the video recording* [it] could . . . choose to do [so] and that [the recording requirement] *really isn't the mandate that is being projected on individual police departments*?" (Emphasis added.) Id., 1794–95.

The present case illustrates the problem with the recording statute. Following their arrest, the defendant, Adrian Flores, and Benjamin Bellavance were transported to the police station and placed in individual cells around 11:30 p.m. At approximately 3:20 a.m., the police began to question the defendant, and he went on to make certain inculpatory statements. During the hearing on the defendant's motion to suppress, the defendant testified that "his English was not very good" and that he was under the influence of alcohol, cocaine, and Percocet during the interrogation. Moreover, he "claimed that he was confused, cold, tired, and scared when questioned by the police." The trial court found the defendant not to be credible. In concluding that the defendant's statement was voluntary and reliable, the court did, however, find credible the testimony of the law enforcement officers who interrogated the defendant. Thus, the testimony of the very law enforcement officials who interrogated the defendant, but failed to preserve the recording of that interrogation, was used to overcome the presumed inadmissibility of the defendant's statement.[2]

---

[2] I do not mean to suggest that I question the trial court's factual findings or legal conclusions that the state proved, by a preponderance of the evidence, that the defendant's statement was voluntarily given and reliable. I merely highlight the fact that, when the police fail to record, or preserve a recording of, a custodial interrogation, in violation of § 54-1o, it is often testimony from the very law enforcement officials who failed to comply with the provisions of § 54-1o that is used to overcome the presumption of inadmissibility. In other words, because there is no recording of the custodial interrogation, we are back to the "swearing contests" between law enforcement and defendants. (Internal quotation marks omitted.) *State* v. *Lockhart,* supra, 298 Conn. 566. It cannot be seriously doubted that law enforcement

State *v.* Flores

One way in which the legislature could provide more meaningful consequences for the failure to record custodial interrogations would be to require a heightened standard of proof from the state to overcome the presumption of inadmissibility. "Increasing the burden of proof is one way to impress the [fact finder] with the importance of the decision . . . ." (Internal quotation marks omitted.) *Santosky* v. *Kramer*, 455 U.S. 745, 764–65, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). As we have explained, "[t]he clear and convincing standard of proof is substantially greater than the usual civil standard of a preponderance of the evidence, but less than the highest legal standard of proof beyond a reasonable doubt." *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 794, 700 A.2d 1108 (1997). Implementing the intermediate level, clear and convincing standard to overcome the presumption of inadmissibility would help to ensure that the unrecorded statement is truly voluntarily given and reliable. See id., 795 ("the clear and convincing evidence standard should operate as a weighty caution [on] the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory" (internal quotation marks omitted)).

The United States Supreme Court has required "an intermediate standard of proof—clear and convincing evidence—when the individual interests at stake in a state proceeding are both particularly important and more substantial than mere loss of money." (Emphasis omitted; internal quotation marks omitted.) *Fish* v. *Fish*, 285 Conn. 24, 70, 939 A.2d 1040 (2008). Connecticut law implements the clear and convincing standard in a variety of contexts, including those that involve only monetary disputes. See, e.g., *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 819,

usually prevails in these contests. As a result, the presumption of inadmissibility under § 54-1o provides little incentive for law enforcement to record custodial interrogations or consequences for not having done so.

State *v.* Flores

955 A.2d 15 (2008) (clear and convincing standard is appropriate standard in common-law fraud cases); *Notopoulos* v. *Statewide Grievance Committee*, 277 Conn. 218, 226, 890 A.2d 509 (clear and convincing standard is applicable when determining whether attorney violated Rules of Professional Conduct), cert. denied, 549 U.S. 823, 127 S. Ct. 157, 166 L. Ed. 2d 39 (2006); *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 163–64, 681 A.2d 293 (1996) (clear and convincing evidence standard of proof is required to establish collusion); *Papallo* v. *Lefebvre*, 172 Conn. App. 746, 754, 161 A.3d 603 (2017) (clear and convincing standard of proof is required to establish fiduciary fair dealing). It seems apparent that ensuring the reliability and voluntariness of an unrecorded statement, given in a custodial interrogation by an individual suspected of having committed a very serious felony and potentially facing decades in prison, is weightier than any context involving a monetary dispute.

Several states require a showing by clear and convincing evidence, either in the context of an exception to the recording requirement or to prove the voluntariness of an unrecorded confession. See, e.g., Cal. Penal Code § 859.5 (d) (Deering Supp. 2021) ("[a] person's statements that were not electronically recorded pursuant to this section may be admitted into evidence in a criminal proceeding or in a juvenile court proceeding, as applicable, if the court finds that all of the following apply . . . (2) [t]he prosecution has proven by clear and convincing evidence that the statements were made voluntarily"); D.C. Code § 5-116.03 (2019) ("Any statement of a person accused of a criminal offense in the Superior Court of the District of Columbia that is obtained in violation of [the recording statute] shall be subject to the rebuttable presumption that it is involuntary. This presumption may be overcome if the prosecution proves by clear and convincing evidence that the state-

State *v.* Flores

ment was voluntarily given.''); N.C. Gen. Stat. § 15A-211 (e) (2019) (''If the court finds that the defendant was subjected to a custodial interrogation that was not electronically recorded in its entirety, any statements made by the defendant after that non-electronically recorded custodial interrogation, even if made during an interrogation that is otherwise in compliance with this section, may be questioned with regard to the voluntariness and reliability of the statement. The State may establish through clear and convincing evidence that the statement was both voluntary and reliable and that law enforcement officers had good cause for failing to electronically record the interrogation in its entirety.''); Ind. R. Evid. 617 (a) (''[i]n a felony criminal prosecution, evidence of a statement made by a person during a Custodial Interrogation in a Place of Detention shall not be admitted against the person unless an Electronic Recording of the statement was made, preserved, and is available at trial, except upon clear and convincing proof of any one of the following [exceptions]'').

Another way in which the legislature could provide more meaningful consequences for the failure to record custodial interrogations would be to require a jury instruction that would alert the jury to the fact that the police did not comply with the recording mandate of the statute. For example, state recording statutes in Michigan, Nebraska, New York, North Carolina, and Wisconsin provide for a jury instruction requirement when the police fail to record certain custodial interrogations. See Mich. Comp. Laws Serv. § 763.9 (LexisNexis 2016) (''the jury shall be instructed that it is the law of this state to record statements of an individual in custodial detention who is under interrogation for a major felony and that the jury may consider the absence of a recording in evaluating the evidence relating to the individual's statement''); Neb. Rev. Stat. § 29-4504 (2016) (''if a law enforcement officer fails to comply

State *v.* Flores

with [the recording statute], a court shall instruct the
jury that they may draw an adverse inference for the
law enforcement officer's failure to comply with such
[statute]''); N.Y. Crim. Proc. Law § 60.45 (3) (d) (McKin-
ney 2019) (''upon request of the defendant, the court
must instruct the jury that the people's failure to record
the defendant's confession, admission or other state-
ment as required . . . may be weighed as a factor, but
not as the sole factor, in determining whether such
confession, admission or other statement was volunta-
rily made, or was made at all''); N.C. Gen. Stat. § 15A-
211 (f) (3) (2019) (''[w]hen evidence of compliance or
noncompliance with the requirements of this section
has been presented at trial, the jury shall be instructed
that it may consider credible evidence of compliance or
noncompliance to determine whether the defendant's
statement was voluntary and reliable''); Wis. Stat. Ann.
§ 972.115 (2) (a) (West 2007) (''upon a request made by
the defendant . . . and unless the state asserts and the
court finds that [certain conditions apply] or that good
cause exists for not providing an instruction, the court
shall instruct the jury that it is the policy of this state
to make an audio or audio and visual recording of a
custodial interrogation of a person suspected of com-
mitting a felony and that the jury may consider the
absence of an audio or audio and visual recording of
the interrogation in evaluating the evidence relating to
the interrogation and the statement in the case'').

New Jersey and Massachusetts also require jury
instructions when the police fail to follow laws requiring
that custodial interrogations be recorded. New Jersey's
electronic recordation law provides that ''[t]he failure
to electronically record a defendant's custodial interro-
gation in a place of detention shall be a factor for consid-
eration by the trial court in determining the
admissibility of a statement, and by the jury in determin-
ing whether the statement was made, and if so, what

State *v.* Flores

weight, if any, to give to the statement.'' N.J. Court Rules 3:17 (d); see *State* v. *Hubbard*, 222 N.J. 249, 263, 118 A.3d 314 (2015) (''[f]ollowing a comprehensive study of 'whether and how to implement the benefits of recording electronically part, or all, of custodial interrogations,' *State* v. *Cook*, 179 N.J. 533, 561, 847 A.2d 530 (2004), the [c]ourt adopted [r]ule 3:17 in 2005''). Subsection (e) of rule 3:17 provides in relevant part that, ''[i]n the absence of an electronic recordation . . . the court shall, upon request of the defendant, provide the jury with a cautionary instruction.'' N.J. Court Rules 3:17 (e). ''[A] report issued by the New Jersey Supreme Court Special Committee on Recordation of Custodial Interrogations in 2005 recommended an instruction that the jury has 'not been provided with a complete picture of all of the facts surrounding the defendant's alleged statement and the precise details of that statement.' '' *State* v. *Lockhart*, supra, 298 Conn. 564 n.11. Similarly, the Massachusetts Supreme Judicial Court has explained that a defendant is ''entitled ([upon] request) to a jury instruction advising that the [s]tate's highest court has expressed a preference that [custodial] interrogations be recorded whenever practicable, and cautioning the jury that, because of the absence of any recording of the interrogation in the case before [it], [it] should weigh evidence of the defendant's alleged statement with great caution and care.'' *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447–48, 813 N.E.2d 516 (2004).

In situations such as that in the present case, in which law enforcement failed to preserve the recording of the custodial interrogation; see General Statutes § 54-1o (c); it may well be appropriate for the trial court to provide an adverse inference instruction similar to the one provided, in the civil context, for spoliation of evidence. See, e.g., *United States* v. *Johnson*, 996 F.3d 200, 216–17 (4th Cir. 2021) (''[w]e observe . . . that if on

State *v.* Flores

remand the [trial] court rejects the defendants' due
process claim [premised on the government's failure to
preserve evidence] again and conducts a retrial, the
court should assess anew whether the defendants are
entitled to an adverse inference instruction''); *People* v.
*Grovner*, 206 App. Div. 3d 1638, 1641, 168 N.Y.S.3d 606
(2022) (given that exculpatory value of video that law
enforcement failed to preserve was speculative, trial
court did not abuse its discretion in providing permis-
sive adverse inference instruction); see also, e.g., *Mills*
v. *District of Columbia*, 259 A.3d 750, 762 (D.C. 2021)
(''[w]hen a trial court determines that the government
has . . . fail[ed] to preserve discoverable evidence, the
court has discretion to select from [an] extremely broad
range of sanctions for corrective action that is just
under the circumstances'' (internal quotation marks
omitted)). Of course, a criminal defendant would also
be free to raise a due process challenge based on the
state's failure to preserve evidence that may be useful
to him. See, e.g., *State* v. *Morales*, 232 Conn. 707, 719–20,
657 A.2d 585 (1995).

If I understand the legislature's objective correctly,
I urge it to consider whether to amend § 54-1o to provide
more meaningful safeguards in situations in which law
enforcement fails to record custodial interrogations.
Without more meaningful safeguards, the statute pro-
vides little realistic protection. Notwithstanding my
concerns with the statutory scheme, as I have articu-
lated them, I am fully in agreement with the majority
that, in this case, the trial court correctly concluded,
under the current framework set forth in § 54-1o, that
the state established, by a preponderance of the evi-
dence, that the defendant's statement was both volun-
tary and reliable and, therefore, admissible, despite the
failure of the police to preserve the recording of the
defendant's custodial interrogation.

For the foregoing reasons, I respectfully concur.